Donna OCHS, Lyle Myers and Beatrice
Myers, Appellants,

v.

Reynaldo MARTINEZ, Appellee.

No. 04–89–00007–CV.

Court of Appeals of Texas,
San Antonio.

May 16, 1990.

Thomas Rocha, Jr., San Antonio, for appellants.

Dan Carabin, San Antonio, for appellee.

Before BUTTS, CHAPA and BIERY, JJ.

## OPINION ON APPELLEE'S MOTION FOR REHEARING

BIERY, Justice.

The appellee's motion for rehearing is denied. The opinion of January 17, 1990 is withdrawn and this opinion is substituted.

This is an appeal from an order changing managing conservatorship of two young girls from their mother to their father. Appellants are the girls' mother, Donna Ochs, and their maternal grandparents, Lyle and Beatrice Myers.[1] Custody of the two girls had been awarded to the mother upon the couple's divorce in 1986. As the result of a 1988 jury trial, the father obtained the order changing managing conservatorship to himself. The jury's decision that custody should be transferred to the father was based upon testimony by the father's witnesses that the mother's new husband had sexually abused the younger of the two girls. We reverse and remand this cause to the trial court for a new trial.

Reynaldo and Donna Martinez were divorced, with custody of their daughters E___ and H___, ages five and three respectively at the time of the divorce, being awarded to Donna. Both Reynaldo and Donna were married to other persons shortly thereafter. The girls then made their home with their mother, Donna, and their new stepfather, Jack Ochs. At the trial on the change of custody, Reynaldo Martinez presented evidence that H___ had been sexually abused by her new stepfather, and appellants presented evidence to the contrary. In brief, the following evidence was presented:

In a videotaped interview with a social worker before the trial, H___ described alleged sexual abuse by her stepfather.

---

1. The children's maternal grandparents intervened in this lawsuit seeking to be named managing conservators in the event that their daughter, appellant Donna Ochs, failed to retain custody.

The videotape was shown to the jury during trial. Later, during a pre-trial hearing before the trial judge in chambers, the child recanted, denying that any abuse had taken place. The child's recantation testimony was read to the jury during the trial.

The remainder of the testimony upon which the jury based its decision consisted of what the child is reputed to have related to her paternal grandmother, her father, her stepmother, a policeman, a psychologist, and a medical doctor. No physical evidence existed which indicated that sexual abuse had occurred, nor was there any other corroboration of the testimony about abuse.

Based on the evidence presented involving sexual abuse allegations, the jury found that the girls' circumstances were materially and substantially changed, that retention of the mother as managing conservator would be injurious to the girls' welfare, and that positive improvement would result from transfer of custody to the girls' father. *See* TEX.FAM.CODE § 14.08(c)(1) (Vernon 1986 & Supp.1990).

Donna Ochs and Mr. and Mrs. Myers assert nine points of error on appeal. In points of error two, three, four, seven, and eight, appellants allege that the trial court committed error by allowing testimony from Reynaldo Martinez' witnesses which was inadmissible under the Texas Rules of Civil Evidence and the Texas Family Code. We agree, and sustain these points of error.

\*   \*   \*   \*   \*   \*

Appellants' first two points of error deal with the videotape introduced by Reynaldo Martinez which showed H___ being questioned about sexual abuse by a social worker from the Texas Department of Human Services.

■ Appellants' first point of error attacks the constitutionality, under the Sixth Amendment to the U.S. Constitution, of the Texas Family Code section providing for the admission into evidence of the video-

tape. Section 11.21 of the Texas Family Code provides for the admission of videotaped testimony of a child 12 years of age or younger who is alleged to have been abused. TEX.FAM.CODE ANN. § 11.21 (Vernon 1986). The Texas Family Code section is virtually identical to Art. 38.071 of the Texas Code of Criminal Procedure except that the criminal statute mandates that the child be available to testify. TEX. CODE CRIM.PROC.ANN. art. 38.071 (Vernon Supp.1989). Article 38.071 has been held unconstitutional by the Texas Court of Criminal Appeals. *Long v. State*, 742 S.W.2d 302, 318–19 (Tex.Crim.App.1987). The decision in Long was based upon denial of the right of an accused to confront witnesses against him as provided by the Sixth Amendment. The amendment applies by its own terms only to "all criminal prosecutions" and therefore is inapplicable in civil cases. U.S. CONST. AMEND. VI. The appellants' first point of error is overruled.

■ Appellants contend by their second point of error that H___ was subjected to leading questions during the videotaped interview which was shown to the jury. The Family Code provision for videotaping of a child's testimony prohibits questions calculated to lead the child to make a particular statement. TEX.FAM.CODE § 11.21(b)(4) (Vernon 1986). Appellants assert that the social worker, while interviewing H___ on videotape, used leading questions prohibited by the statute. *Id.; see also Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984).

Upon our viewing of the videotape, we found certain questions posed by the interviewer to be leading. The conversation between the social worker and H___ follows:

Q. Here we go. My name is ___ and I am a child protective services specialist for the Department of Human Services located at 700 Steves in San Antonio, Texas. Today I am talking to H___ Martinez. Hi. H___, can you tell me how old you are?

A. Four and a half.

Q. Four and a half. Do you know when your birthday is?

A. I forgot.

Q. You forgot. Do you know what month you were born in?

A. No. This was a long long time ago.

Q. Okay. You're four and a half. And let's see. So, that means you don't go to school yet, right?

A. Right.

Q. All right.

A. I used to go to school, but not any more.

Q. Okay. Where do you live right now, H____, who do you live with?

A. My stepdad and my real mama—and my real mama.

Q. Your stepdad and your real mom. Do you know what their names are?

A. Donna Ochs and Jack Ochs.

Q. Okay. Do you know their addresses or your address where you live, the street that you live on?

A. [____.] (Child names street.)

Q. Okay. Do you know your telephone number by any chance?

A. [____.] (Child recites phone number.)

Q. That is very good. Okay. Okay. Let me ask you some questions. Let's see. Since you're not in school yet, let me ask you some other questions to see what you know. If I said that your—that your bear here is—

A. Blue.

Q. —is blue, would that be a truth or a lie?

Q. A lie.

A. A lie, because what color is your bear?

Q. Pink.

A. Okay. And if I said that your stockings here are green, is that a truth or a lie?

A. A lie.

Q. Okay. Because what color are they?

A. White.

Q. White. Okay. If I said I have on a gold watch, is that the truth or a lie?

A. A lie.

Q. What color is that? I think it's gold, isn't it? That would be a truth. Okay. So when we talk today, I want to talk about what it means to tell the truth and a lie. All right?

A. Okay.

Q. And you told me pretty much that you know the difference there. What happens when you tell a lie?

A. I think you got a hundred spankings.

Q. You got a hundred spankings? Okay. But when you tell the truth, that's right a good thing; right?

A. Right.

Q. Okay. So, will you promise to tell me today that everything that you tell me is the truth? It would be real important to tell me the truth?

A. Uh-huh.

Q. Okay. We're going to be talking about something that happened to you and we're going to use some of these dolls, okay? These are special dolls that we use when we talk to boys and girls. And they have all their body parts on them. And I would like for you to tell me what you call all of these body parts, okay?

A. Okay.

Q. Okay. Just a second here. We have four dolls and some of them are men dolls and some of them are lady dolls.

A. Okay.

Q. Okay. Do you think we could talk about, first of all, which one of these would look most like you. Okay. If we took all four of these dolls, if we took all of these dolls, which one of these dolls do you think would be most like you? Do you think you can tell? That one? Okay. That is

a little girl doll. Okay. When I said we were going to talk about something, it's something that happened to you that got you upset, right?

A. Right.

Q. Which one of these dolls look most like the person that's upset you? Was it a man person or a lady?

A. A man.

Q. A man?

A. Uh-huh.

Q. Which one of these dolls would be the man?

A. That one. It was that one because he didn't have any moustache.

Q. This one?

A. Yeah. No, that one.

Q. Which is the man doll? There is a little boy and a man and a lady. This one? Okay. Okay. Let us start with the one that is the little girl like you?

A. Okay.

Q. Let's see. What do you call this up here?

A. Her hair.

Q. Her hair?

A. Uh-huh.

Q. Okay. What about this?

A. Mouth.

Q. Mouth. Do you have a name for these?

A. Titties.

Q. Titties? Okay. And how about this?

A. Bellybutton.

Q. Bellybutton. And this?

A. Her arms.

Q. Arms. Okay. And these?

A. Legs.

Q. Legs. Do you have a name for this?

A. Baby box.

Q. Baby box? Okay. How about back here?

A. Back.

Q. Back. Okay. How about this?

A. Butt.

Q. Okay. Okay. Now, let's look at the man doll. He's a little bit different, isn't he?

A. Yup.

Q. What are these called right here?

A. His eyes.

Q. Eyes. And you said this is what?

A. His moustache.

Q. Moustache. Okay. How about these?

A. Hand.

Q. Hand. Okay. And let's take these off. What are these?

A. His legs.

Q. Okay. Do you have a name for this? Do you have a name for this right here?

A. No.

Q. What do you call that?

A. Weiner.

Q. A weiner. Okay. Do you have a name for this? What is that called?

A. A butt.

Q. A butt? Oh, Okay. This here? That is the butt? Okay. Okay. Now, I need you to talk about whatever it was that upset you, okay? If this is you—this is H____, who are we talking about when we hold up this doll? Who would this be that upset you?

A. Daddy.

Q. Daddy. What's daddy's name?

A. Jack Ochs.

Q. Jack Ochs. Okay. Can you show me with the dolls what Jack did to you that got you upset? Okay. And you call that a weiner? He put the point near in your—

A. Yeah.

Q. —baby box?

A. Yeah, like this.

Q. The tip of it?

A. Uhm-hum.

Q. Okay. Did he touch you anywhere else, H____?

A. No, not with his weiner.

Q. Okay. What about with his hands? Did he touch you anywhere—anywhere else on your body besides your baby box?

A. That's all.

Q. That's all. Okay. We will just leave it right here. Okay. When this happened, where were you? What house were you at?

A. My grandpa's.

Q. Your grandpa's. The one on [street name]? Is that where you said you lived?

A. Yeah.

Q. Who else would be home, H___? Would it be you and Jack and who else? Would anybody else be home but the two of you?

A. One day mom—this was at school and one day I went to use the bathroom.

Q. Okay. So, this happened on two different days?

A. Yup.

Q. Okay. Let's talk when it happened. Do you remember what month it was or—

A. It was—I didn't know what month it was.

Q. Okay. You were four when this happened or do you think you were younger than four?

A. Four.

Q. You were four? Okay. So, that must have meant, let's see, 1987. Okay. Was it wintertime or summertime the first time it happened? Was the weather cold outside or hot?

A. Yes.

Q. Which one, cold or hot?

A. One day it was cold and the other it was hot.

Q. Okay. Was the first time that it happened before Christmas this year or after?

A. After. I mean before.

Q. Before. Okay. And this happened two different times. Okay. Where would your mom be when this happened? Would she be at work or at the store or—

A. She never goes to work anymore.

Q. Okay. Where would she be when this happened?

A. At the store maybe.

Q. Maybe at the store?

A. And the other day she was at the store, too.

Q. Okay. When this happened, what room were you at? What room in your house were you in, the bathroom or—

A. My mama's. My mama's room.

Q. In your mama's room. Were you on the bed or were you sitting up, standing up?

A. On the bed.

Q. On the bed. Okay. Can you tell me about your clothes. Did you have your clothes on or your clothes off?

A. Just had my panties off.

Q. You had your panties off?

A. My panties off—my panties was off and he put his weiner up my—you know, my baby box.

Q. Okay. You said Jack took your panties off? Is that what you said?

A. No, I—yeah, he did. He took my panties off.

Q. Okay. Did he have his panties on or with his panties off?

A. Off. And his—and his pants were off.

Q. Okay. So, he took them off. Did he say anything to you when he took them off?

A. No.

Q. No.

A. But after it, he—he said keep it a secret.

Q. Afterwards to keep it a secret. Okay. So, he just put the tip of his weiner between inside your baby box, is that what you said?

A. Hum-uhm.

Q. Was his weiner hard or soft?

A. Like he was hard.

Q. Uhm-hum?

A. And the tip was soft.

Q. Was soft. Did anything come out of that or—

A. Only when I was on, not like that when it was—

Q. Did—did it get hard—I mean did it get soft then?

A. No.

Q. Did anything come out? Any white stuff or any tee-tee come out?

A. White.

Q. White? Okay.

A. Only white.

Q. Only white. Okay. So, then he said keep it a secret?

A. Yeah.

Q. Don't tell anyone?

A. Uhm-hum.

Q. Did he ever show you any pictures of anybody that didn't have clothes on?

A. No.

Q. Did he ever take your picture—

A. No.

Q. —with no clothes on?

A. No.

Q. No? Do you know if Jack ever did this to your sister, E___, or do you think that he possibly didn't?

A. He didn't.

Q. He didn't. Okay. Did you tell your mom, H___, or were you afraid to tell or—

A. I was afraid. Afraid.

Q. You were afraid? Hum. What do you think would have happened if you told your mom? Do you think—

A. She would get mad at my daddy and me.

Q. She would get mad at both of you?

A. No, she would only get mad at my daddy. Just at Daddy.

Q. Okay. Is there anything else that you can think of that Jack did that made you upset? Okay?

A. Only when he spanks me, he makes me really upset. I mean really upset.

Q. It's not much fun to get a spanking, is it?

A. No. He gets me really upset.

Q. Did he ever threaten to give you a spanking if you didn't—if you didn't let him touch your baby box?

A. No.

Q. No? Okay. Okay. Just if you did something that you weren't supposed to?

A. Yeah. But I had to tell them. That's a good girl.

Q. Okay. If Jack was here, would you have anything to say to him?

A. No.

Q. No?

A. I would say, "I am upset with you, Daddy, because you put my baby box—your weiner in my baby box. So, I had to tell."

Q. Okay. And you know that's not right that he did that, right?

A. Right.

Q. Okay. If anybody else does that to you—well, has anybody else beside Jack done that?

A. (Shakes head).

Q. Okay. Well, if they do, you know to tell your mom this time, right?

A. Okay.

Q. Or your dad, your real dad?

A. Yeah.

Q. Okay. Okay. Thanks, H___.

\* \* \* \* \* \*

◼ In his motion for rehearing, Mr. Martinez cites us to common law authority and to treatises for the proposition that some leading questions are permissible when examining children. The authorities cited, however, predate the legislative enactment of § 11.21 of the Family Code. By

not allowing for any leading questions in cases governed by § 11.21(b)(4), the legislative branch has abrogated the common law rule insofar as the uncross-examined videotaped testimony of children under the age of 12 is concerned. Many of the questions asked of H____ by the social worker on the videotape were leading questions which suggested a response, as evidenced by H____'s frequent "yes" or "no" answers. Under the strictures of § 11.21, questions directed to a child must be open ended and not suggestive of a response. A permissible inquiry, for example, would be, "What do you and Daddy do when you are alone?"

The vehicle of videotape compounds the effect of its erroneous admission. The powerful effect of videotape on jurors has been recognized. *See Misko*, Videotape for Litigation, 26 S.TEX.L.J. 485 (1985). Videotape makes a more lasting and intense impression on jurors than other forms of proof:

> [It] is a convincing means of demonstrative evidence because we live in the age of television. There is something about television and the videotape that has an unspoken credibility about it. They start the day in the morning watching "Good Morning, America" and wind up at night with the 11:00 news, if not something worse, and they are accustomed to it, and they accept it ...

Witke, Higgins and Babcock, "Video Tape is Worth a Thousand Words": Use of Demonstrative Evidence in the Defense of a Product Liability Case, 50 Ins.Counsel J. 94, 97 (1983).

To the extent that the video should have been edited to exclude leading questions, appellants' second point of error is sustained.

■ In point of error eight, appellants assert that the trial court erred in allowing lay witnesses including H____'s grandmother, father, and new stepmother to testify that H____ was telling the truth about the alleged sexual abuse. A witness may not give an opinion concerning the truth or falsity of another's testimony, for it is the jury's task to assess the credibility of witnesses. *Miller v. State*, 757 S.W.2d 880, 883 (Tex.App.—Dallas 1988, pet. ref'd); *Black v. State*, 634 S.W.2d 356, 358 (Tex. App.—Dallas 1982, no pet.)[2]. For this reason, we find that admission of the testimony was erroneous.[3] Point of error eight is sustained.

■ Appellants' third and fourth points of error focus exclusively on expert opinion testimony regarding H____'s truthfulness. They argue that the trial court, in the absence of objective evidence, erred in admitting expert opinion testimony that H____ had been sexually abused because such testimony would necessarily be based on nothing more than the experts' belief that H____ was telling the truth.

**2.** Criminal cases are cited as support where no difference exists between the applicability of civil and criminal rules of evidence. The two sets of rules are very similar; the original intent of the State Bar Liaison Committee appointed to draft rules of evidence for Texas courts was to provide an integrated code which would govern both civil and criminal proceedings. Weir & Barnards, *Application of the New Rules of Evidence to Criminal Proceedings*, 48 TEX.B.J. 518 (1985).

**3.** The appellee asserts that appellants are estopped to complain on appeal about the admission of lay and expert opinion testimony as to the credibility of the child because of an "invited error" doctrine. The appellee suggests that any error was invited by the appellants themselves by appellants' engaging in the same prohibited conduct of which they complain on appeal. The appellee's reliance on invited error is misplaced. Our review of the record shows that it was appellee, and not appellant, who first introduced the improper testimony regarding the child's truthfulness. The principle on which appellee relies holds that a party may not complain on appeal of error which he has invited. *Dickson v. Weingarten, Inc.*, 498 S.W.2d 388, 391 (Tex.Civ.App.—1973, writ ref'd n.r.e.); *Allison v. Simmons*, 306 S.W.2d 206, 210 (writ ref'd n.r.e.). Thus, because the appellants' improper testimony was provoked by the improper remarks of like nature by the appellees, it would be the appellees and not the appellants who would be estopped from complaining of this point of error on appeal. *See, e.g., Pouncy v. Garner*, 626 S.W.2d 337, 340 (Tex.App.—Tyler 1981, writ ref'd n.r.e.); *Cocke v. State*, 391 S.W.2d 553, 555 (Tex.Civ.App.—Austin 1965, no writ).

Reynaldo Martinez offered psychologist David Feigenbaum as an expert. Feigenbaum had administered psychological tests to H___ and reported nothing from the tests which would indicate that the child was victim of sexual abuse. In addition to administering the tests, Feigenbaum interviewed H___ concerning the alleged incidents of sexual abuse. On direct examination by Reynaldo Martinez' counsel, Feigenbaum stated:

"... my opinion was that H___ was sexually abused on at least one occasion. Her story was given reluctantly to me, and suggested the similar data that she has given other people previous to me. It is illogical to assume that a child that was four or five years old would be able to lie so effectively to so many people. She is an open little girl, she is assertive, and I don't think that she would be brainwashed to be consistently lying. The research in children suggests that is very unlikely also."

While an expert may testify to matters within his expertise, expert testimony concerning a complainant's propensity to tell the truth is impermissible. *Kirkpatrick v. State*, 747 S.W.2d 833, 836 (Tex. App.—Dallas 1987, pet. ref'd). We find that many of Feigenbaum's conclusions were based not on matters within his expertise as a psychologist but instead on his belief that H___ was telling the truth. Credibility of witnesses is within the exclusive province of the jury. *Leyva v. Pacheco*, 163 Tex. 638, 358 S.W.2d 547, 549 (1962). An expert's opinion about the alleged victim's truthfulness is usually not allowable because it invades the exclusive province of the jury. *People v. W. Koon*, 713 P.2d 410, 412 (Colo.Ct.App.1985); *State v. Myers*, 359 N.W.2d 604, 610 (Minn.1984).

We find no Texas civil cases which deal with expert psychological testimony relating to the credibility of a child who is alleged to have been sexually abused; the issue has been considered and such testimony has been ruled inadmissible in a few Texas criminal cases. *Miller v. State*, 757 S.W.2d 880, 883 (Tex.App.—Dallas 1988, pet. ref'd); *Kirkpatrick v. State*, 747 S.W.2d 833, 836 (Tex.App.—Dallas 1987, pet. ref'd.). The majority of courts in other states have excluded such testimony. *Tevlin v. People*, 715 P.2d 338, 341 (Colo.1986); *State v. Middleton*, 294 Or. 427, 657 P.2d 1215, 1221 (1983); *In the Interest of K.L.M.*, 146 Ill.App.3d 489, 100 Ill.Dec. 197, 203, 496 N.E.2d 1262, 1268 (1986); *State v. Fitzgerald*, 39 Wash.App. 652, 694 P.2d 1117 (1985). On the other hand, a few courts have been willing to allow mental health experts to testify that in their opinion a particular child was truthful, accurate, or credible, that a child was a victim of sexual abuse, or that children generally do not lie about having been sexually abused. *State v. Kim*, 64 Haw. 598, 645 P.2d 1330, 1339 (1982); *Allison v. State*, 179 Ga.App. 303, 346 S.E.2d 380, 383–84 (1986). Courts have expressed concern about such testimony's aura of reliability, a factor which may lead the jury to abdicate its role of determining witnesses' credibility. *See generally* Roe, *Expert Testimony in Child Sexual Abuse Cases*, 40 U.Miami L.Rev. 97 (1985); R. Lyman & M. Roberts, *Mental Health Testimony in Child Custody Litigation*, 9 Law & Psych.Rev. 15 (1985); Wells, *Expert Testimony—To Admit or Not Admit*, 1983 Fla.B.J. 673, 675. One court has reasoned that the lack of proof of sexual abuse should not necessarily justify the use of an expert, because in the view of the absence of concrete evidence, the jury may be unduly inclined to rely upon the expert's opinion as to the issue as to whether sexual abuse occurred. *State v. Logue*, 372 N.W.2d 151, 158 (S.D. 1985). Although psychological testimony has contributed to a greater understanding of the complex issues in child sexual abuse cases, it also may be inaccurate or prejudicial, especially when offered to prove that a child was sexually abused. J. Bulkey, *Psychological Expert Testimony in Child Sexual Abuse Cases* in E. Nicholson, ed., *Sexual Abuse Allegations in Custody and Visitation Cases*, American Bar Ass'n National Legal Resource Center for Child Advocacy and Protection (1988).

■ Some decisions excluding credibility testimony indicate that testimony about general characteristics of child victims is admissible, or that experts might be permitted to testify that a child sexual abuse victim's behavior is consistent with the behavior of other such victims. *Allison v. State*, 179 Ga.App. 303, 346 S.E.2d 380, 382–84 (1986). Child psychiatrist and Columbia University professor Richard A. Gardner, M.D., has developed the "Sex Abuse Legitimacy Scale" in which he has identified certain criteria as being valuable in differentiating between genuine and fabricated sex abuse when interviewing a child.[4] These criteria include alienation from the child's parents; a reluctance to talk about the incident; an ability to recount the incident in great detail; accuracy of the child's description; fear; and guilt. Gardner at 177–195; McCurley at 33–35. A mental health expert does not invade the province of the jury when he refers to the presence of such criteria as being consistent with a child's claims of having been sexually abused.[5] Dr. Feigenbaum's observation that H____'s story was given to him reluctantly would be admissible under this analysis. A mental health expert, however, may not venture beyond this point by summarily stating his opinion as to whether a child is telling the truth about having been sexually abused. Dr. Feigenbaum's comments to the effect that it is illogical to assume that a child of four or five would be able to lie effectively to so many people, and that H____ is an open and assertive child and unlikely to be brainwashed into telling lies would not be permissible under these guidelines.

Melissa Black, a social worker who investigated the sexual abuse allegations, testified that she believed H____'s story and that H____ was "more credible than almost any four-year-old that I have ever interviewed." For the same reasons we have set forth regarding Dr. Feigenbaum's testimony, we hold the social worker's credibility testimony to be inadmissible as well.

Carla Iavorone, M.D., examined H____ the day after the little girl told her grandmother that she had been sexually molested by her stepfather. Dr. Iavorone testified that she had written the following report after examining H____: "normal physical exam, no physical evidence of abuse, but very strong suspicion of sexual abuse by the child's description." She testified that she was not qualified to give a professional opinion that sexual abuse had occurred.

■ We find that Dr. Iavorone's findings, like psychologist Feigenbaum's, were improperly placed before the jury because her conclusions were based not upon matters within her expertise as a physician but instead upon her belief that H____ was telling the truth. Expert opinion cannot be based upon mere guess or speculation, but must have a proper factual basis. *Southwestern Bell Telephone Co. v. Sims*, 615 S.W.2d 858, 862 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ).

The expert witness testifying on behalf of the appellants, on the other hand, did possess a factual basis for her opinion that H____ had not been abused, as the expert could find no physical signs that abuse had occurred. We find that the trial court erred in admitting expert opinion testimony as to the child's truthfulness. Accordingly, points of error three and four are sustained.

4. For a detailed treatise on sexual abuse allegations in child custody litigation, see R. Gardner, *The Parental Alienation Syndrome and the Differentiation between Fabricated and Genuine Child Sex Abuse* (1987). An excellent resource on the use of psychological testing in resolving custody dispute allegations is M.J. McCurley & M. McCurley, *Psychological Testing*, State Bar of Texas Professional Development Program Marriage Dissolution Course (May 1987) at M29–35.

5. For a comprehensive article designed to acquaint the practitioner with the various forms of psychological testing employed by mental health experts in child custody cases, see M. McCurley, *The MMPI: An Explanatory and Critical Analysis*, State Bar of Texas Professional Development Program Advanced Family Law Course (August 1987).

In their seventh point of error, appellants contend that the trial court erred in permitting three persons (H____'s father and stepmother Reynaldo and Debra Martinez, and police officer Michael Schwab, who took a report from H____) to present hearsay testimony to the jury that H____ had complained to them about alleged sexual abuse. The trial court determined that these witnesses' testimony as to what young H____ had told them about the alleged sexual abuse was admissible, ruling that if Reynaldo Martinez' counsel offered a statement reportedly made by H____, the statement would be allowed into evidence. We agree with appellants that such testimony was inadmissible hearsay.

■ Reynaldo Martinez advances two theories of admissibility of H____'s statements; we find that neither applies. Reynaldo first suggests that the statements were non-hearsay under Rule 801(e)(1)(B) of the Texas Rules of Civil Evidence, which permits the introduction of a prior consistent statement of a witness offered to rebut a charge of recent fabrication. By its terms, 801(e)(1)(B) applies only if the declarant (H____) testifies at the trial and is subject to cross-examination concerning the statement. Here, the declarant (H____) did not testify and was not available for cross-examination.

■ Neither were H____'s statements to others describing the alleged incident admissible, as Reynaldo Martinez contends, under Rule 803(3) of the Texas Rules of Civil Evidence as an exception to the hearsay rule which permits statements pertaining to one's "then existing state of mind, emotion, sensation, or physical condition." Statements admitted under this exception are usually spontaneous remarks about pain or some other sensation, made by the declarant while the sensation, not readily observable by a third party, is being experi-enced. R. LEMPERT & S. SALTZBURG, A MODERN APPROACH TO EVIDENCE ch. 6 at 420 (2d. ed. 1982). The exception does not extend to statements of past external facts or conditions. 1A R.RAY, TEXAS LAW OF EVIDENCE § 843 (Texas Practice 3d ed. 1980 & Supp.1986). H____'s statements to these witnesses do not fall within the exception. Although it was a termination of parental rights case as opposed to a change of custody case, *Richardson v. Green* refused to relax the law of evidence to allow hearsay testimony in a case involving allegations of sexual abuse of a child. 677 S.W.2d 497, 500 (Tex.1984) (reversing trial court judgment terminating father's paternal rights.) We hold that the trial court erred in admitting the hearsay testimony. Point of error seven is sustained.

■ Appellants' ninth point of error suggests that they should have been allowed to present testimony that Reynaldo made conflicting statements about his intentions regarding his daughter E____. In settlement negotiations during trial, Reynaldo indicated that he would be willing to let his ex-wife Donna retain custody of E____ if he could have custody of H____, whereas at trial Reynaldo testified that he loved both daughters equally and had never considered giving up E____. Appellants attempt to show that Reynaldo's first statement was admissible under Rule 408 of the Texas Rules of Evidence, which holds that statements offered to prove "bias or prejudice" are admissible even though they were made during settlement negotiations, of which evidence is ordinarily inadmissible.[6] The Rule 408 exception allowing for admission of evidence of bias or prejudice is a narrow one drafted in consideration of strong Texas judicial policy favoring the disclosure of conflicts of interest among parties to a lawsuit where, for example, a plaintiff and a defendant settle a cause on

---

6. Because the argument was not raised before the trial court or as a point of error before this court, we express no opinion as to whether Reynaldo's declaration would have been admissible for impeachment purposes as a prior in-consistent statement made during settlement negotiations. *See* N. Blakely, *Article IV: Relevancy and Its Limits,* 20 Hous.L.Rev. 151, 241 (1983 Tex.R.Evid. Handbook.)

an agreement that the settling defendant will receive back a percentage of what the plaintiff recovers from the other non-settling defendants. N. Blakely, *Article IV: Relevancy and Its Limits,* 20 Hous.L.Rev. 151, 240 (1983 Tex.R.Evid. Handbook); *see also City of Houston v. Sam P. Wallace and Co.,* 585 S.W.2d 669, 673 (Tex.1979). The appellants' reliance on the Rule 408 exception in view of the facts before us is misplaced. Appellants' ninth point of error is overruled.

In summation, the videotape containing leading questions and the admission of lay opinion testimony and expert opinion testimony regarding H____'s credibility, as well as the admission of improper hearsay testimony, form the basis of our reversal. We are persuaded that these instances of improperly admitted evidence each independently require reversal under Rule 81(b)(1) of the Texas Rules of Appellate Procedure.

Although we are mindful of the difficulty of dealing with children as witnesses and the problems of proof in this type of case, we nevertheless believe that adherence to the rules of law and evidence best balances the rights of all the parties and best serves the interests of justice.

The judgment is reversed and the case is remanded for a new trial.