Carrie JAMES, Appellant,

v.

**TEXAS DEPARTMENT OF HUMAN SERVICES, Appellee.**

No. 6–90–028–CV.

Court of Appeals of Texas, Texarkana.

July 7, 1992.

Carol Hammond, Paris, ad litem for the children.

M.C. Superville, Jr., Asst. County Atty., Lewis F. Boyd, Paris, for Texas Dept. of Human Serv.

Barney Sawyer (court appointed), Paris, for Sherman Goodson.

Ruth Ellen Grant, Paris, for Carrie James.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

BLEIL, Justice.

Carrie James appeals from a judgment terminating her parental rights to two of her children, a boy and a girl, aged nine and eleven, respectively, at the time of trial. The trial also resulted in the termination of the parental rights of Sherman Goodson, the children's father.[1] The significant issues material to our decision concern preliminary trial court rulings, evidentiary rulings, the sufficiency of the evidence, and the jury instructions. We conclude that the trial court erred in several evidentiary rulings which normally would dictate a reversal of the judgment. However, because other properly admitted evidence shows clearly and convincingly that there are grounds for termination, and that termination is in the best interests of the children, we find no reversible error and affirm.

## PRELIMINARY RULINGS

■ Initially, we consider the complaints concerning the trial court's preliminary rulings. The complaints concern the action of the trial court in failing to grant all of James' special exceptions to the pleadings, in allowing the State to file amended pleadings three days before trial, and in failing to sever her trial from that of Sherman Goodson.

James shows no error with respect to these preliminary rulings. Concerning the special exceptions, no appellate complaint is preserved because the trial court did not rule on the special exceptions (TEX.R.APP.P. 52(a)); further, no special exceptions were levied against the pleadings on which the case was tried, thus no error is shown. *Wray v. Lenderman,* 640 S.W.2d 68, 70 (Tex.App.—Tyler 1982, no writ).

■ As to the amendment of the pleadings, James shows no error. Parties may amend their pleadings by filing such pleadings with the clerk at such time as not to operate as a surprise to the opposite party; pleadings offered for filing within seven days of the date of trial shall be filed only after leave of the court is obtained, which leave shall be granted by the court unless there is a showing that such filing will operate as a surprise to the opposite party. TEX.R.CIV.P. 63. Without a showing of surprise, the trial court must grant leave for a party to file the amendment when requested within seven days of trial or thereafter. *Greenhalgh v. Service Lloyds Ins. Co.,* 787 S.W.2d 938, 940 (Tex. 1990). Thus, a party's right to amend under Rule 63 is subject only to the opposing party's right to show surprise. To reverse a trial court's ruling allowing pleadings to be amended, an appellant must show that the trial court abused its discretion; to establish abuse of discretion, the complaining party must claim surprise and request a continuance. *Louisiana & Arkansas Ry. Co. v. Blakely,* 773 S.W.2d 595, 597 (Tex.App.—Texarkana 1989, writ denied). The third amended petition raised no new substantive matters, and because James showed no surprise or prejudice, the trial court is not shown to have abused its discretion in allowing the pleadings to be amended.

■ With regard to the refusal of the trial court to sever this case from that seeking to terminate Sherman Goodson's parental rights, the court again is allowed wide discretion. *See Cherokee Water Co. v. Forderhause,* 641 S.W.2d 522, 525 (Tex. 1982); *see also* TEX.R.CIV.P. 41. The cases against James and Goodson involved common allegations and evidence; in fact, at the crux of the case were sexual acts which the two performed in the presence of the children. James shows no abuse of the trial court's discretion by its refusal to sever the cases.

## EVIDENTIARY RULINGS
## AND SUFFICIENCY

The trial court erred in several particulars in allowing evidence which should have been excluded. Because the sufficiency of

---

1. Sherman Goodson did not appeal.

the evidence is related to our harm analysis, these questions are discussed together. The trial court erred in admitting a videotape of the children, hearsay statements made by them to several witnesses, and an opinion as to the truthfulness of the children.

### a. The videotape

■ The Family Code allows for a videotaped statement of a child to be admitted in proceedings like these.[2] This videotape, however, should not have been admitted for two reasons.

Firstly, TEX.FAM.CODE ANN. § 11.21(b) (Vernon 1986) provides that the statement must not have been made in response to

questioning calculated to lead the child to make a particular statement.[3] By prohibiting leading questions in cases governed by Section 11.21(b)(4), the legislative branch adopted the common-law rule insofar as the uncross-examined videotaped testimony of children under the age of twelve is concerned. *Ochs v. Martinez,* 789 S.W.2d 949, 956 (Tex.App.—San Antonio 1990, writ denied). Under the strictures of TEX.FAM. CODE ANN. § 11.21 (Vernon 1986), questions directed to a child must be open-ended and not suggestive of a response. *Id.* We conclude that the videotape with these children's statements should have been excluded because the questioning was calculated to lead the children to a particular statement.[4] The questioning itself was general-

---

2. TEX.FAM.CODE ANN. § 11.21(b) (Vernon 1986).

3. TEX.FAM.CODE ANN. § 11.21(b)(4) provides: "[T]he statement was not made in response to questioning calculated to lead the child to make a particular statement."

4. Jennifer Sellers, then a worker with the Department of Human Services, took the videotaped statement of the male and female children. Examples of her questioning of the female child, with the name of the child deleted, are as follows:

Q. Can you remember the first time your daddy touched your private parts?
A. No.
Q. You can't? You don't remember?
A. (Child shakes her head no.) Some of it.
. . . .
Q. Can you tell me what you do remember ... Can you show me with the dolls. (Child has the female child doll; Sellers pats child on leg.) You're doing a good job, [child's name]. What did he do?
A. I don't know.
. . . .
Q. You do, too, [states name]. You know, you told me before. Now I just want you to tell me again, okay? (Sellers takes the doll away from the child.)
. . . .
Q. Then what happened? Go ahead and show me. What did he do? (No answer.) It's okay, just tell me the truth, just tell me the truth, [name of child]. (Sellers pats child's leg.)
. . . .
Q. You're sure his clothes were on? (No answer.) Tell me the truth, [name of child], okay?
. . . .
Q. So he didn't take his clothes off. You're sure. That's the truth? (Sellers lays the adult male doll on top of the female child doll.)

A. (Child nods her head.)
. . . .
Q. I want you to tell me about the first time he touched your pee-pee, your poo-poo....
A. I don't remember the first time.
Q. Well, remember the time that you told me about. Was not that the first time?
A. I don't know.
Q. Okay. What was the first time then. You must remember it. (Pause) Okay. Come on, [child's name], I want you to talk with me like you talked to me last week. Okay. (Sellers pats child's leg.) This is very important, that you tell me the truth....
. . . .
A. I don't remember the first time he touched me.
Q. You don't? Okay, well tell me the time that you remember, what you remember, whenever that was that you told me about the last time we talked. Show me what he did, okay. Okay, show me with the doll. (Sellers starts to pull up the blouse of the female child doll.)
. . . .
Q. Okay, what did he do?
A. He touched me.
Q. He what? He touched you? Okay, show me with the doll. (Sellers begins demonstrating with the dolls.)
Q. Did he take off your....
A. No.
Q. He didn't take off your clothes?
A. No.
Q. He just touched you, like that? (Sellers demonstrates with the dolls.) Over your panties?
A. (Child nods her head.)
. . . .
Q. I want you to tell me the first time that he touched you when he took your clothes off. Okay? Remember the time you told me about before? I want you to tell me again. Okay? Okay, go ahead....

....

Q. Tell me what happened, okay. Just go ahead and show me. (Pause) [Child's name], come on. This is very important that you tell me like you told me last week. Okay? You remember that? When you told me last week. Okay? Come on. It's okay. (Sellers pats child's leg.) I just want you to tell me the truth. Okay? And tell me like you did last time. There's nothing to be afraid of. You're not going to get in trouble, okay. This is right that you're telling me about this. Go ahead. Show me what he did.

A. I don't remember.

Q. You don't remember? Well, you remembered last week. You told me all about it. (Pause) Do you remember when you told me all about it? Was that not the truth? Last week?

A. Yes.

Q. Okay, well, tell me. Tell me. I just want you to tell me the same thing you told me last week, [child's name]. Okay? That's all it is. It's okay. There is nothing to be afraid of. (Sellers pats child's leg.) Now, you know me, [child's name]. This is just Jennifer here. Okay? There's nothing to be afraid of. So tell me again what happened last week. What you told me last week that happened. Okay? Go ahead and show me with the doll. What did he do?

A. (Child takes the doll.)

Q. Tell me about what he—when your clothes were off and he touched you. You told me he touched you with his wee-wee. (Sellers put her hands on the doll.)

A. He took his clothes off.

Q. He took his clothes off. Okay. (Sellers begins to undress the adult male doll.) And was this at home in the bedroom?

A. (Child nods her head yes.)

Q. Okay. (Sellers continues to undress the doll.) All of his clothes off?

A. (Child nods her head.)

Q. Okay. Did he take them all the way off?

A. No.

Q. What did he do? Did he leave them like this? (Sellers demonstrates with the doll.)

A. (Child nods her head.)

Q. Then what did he do to you? Show me with the doll. Show me what he did to you.

A. He was on top of me.

Q. Okay. Did he take your clothes off?

A. (Child nods her head.)

Q. Okay. Show me what he did. (Sellers lifts up the blouse of the doll and helps the child undress the female child doll.) Okay, took your clothes off. (Sellers takes the clothes off the doll.) Did he pull them all the way off or just down to there?

A. Down to there. (Sellers is still touching doll.)

....

Q. Did this happen one time or more than one time?

A. One time.

Q. One time.... This didn't happen more than one time, when he did these things to you?

A. One time.

Q. [Child's name], that's not what you told me last week. You told me about when he slapped you one time when this happened. You remember that?

A. Yes.

Q. Okay. That was a different time wasn't it? Okay. What happened that time? (Pause) Can you tell me?

A. He slapped me.

Q. He slapped you. And then what did he do?

A. He slapped me on the floor.

Q. He slapped you and you fell on the floor?

A. Yes.

Q. Okay. Then what happened? Did you fall on the floor backwards like this? (Sellers demonstrates with the doll.)

A. I fell sideways.

Q. You fell sideways. What did he slap you for, [child's name]?

A. I don't know. He just slapped me.

Q. He just slapped you. Okay. You fell sideways. Like that? (Sellers demonstrates with doll.)

....

Q. Then what happened? It's okay, honey. Just tell me the truth. (Sellers pats child's leg.) That's all I want. And this will be the last time we have to talk about it.

A. And then I got up.

Q. You got up. (Sellers demonstrates with the doll.) That's not what you told me last week.

A. I done forgot the other part.

Q. Okay. Then you got up. (Sellers has a doll in each hand.) Then what happened? Show me with the doll.

A. And then I went in the living room.

Q. You went into the living room. Okay. You went into the living room. (Sellers demonstrates with the dolls.)

....

Q. The time that your daddy slapped you, he didn't put his wee-wee in your poo-poo?

A. No.

Q. He didn't do that?

A. He put it in my mouth.

Q. He put it in your mouth? He put his mouth in your poo-poo. (Child nods her head.) He put his mouth down here? (Sellers demonstrates with the dolls.)

Examples of the questioning of the male child include the following questions and answers:

Q. Okay. Did you ever lay on top of [your sister]?

A. No.

Q. You didn't? You never did this to [your sister]? (Sellers demonstrates with the dolls.)

A. No.

ly leading. In addition, Sellers' nonverbal communication, such as her approving, affectionate pats in response to desired answers and her active, demonstrative use of the dolls, coupled with her argumentative refusal to accept undesired answers, contributed to making a particular statement. Thus, the statement should not have been admitted as evidence.

 Secondly, the videotaped statement should have been excluded as a sanction for discovery abuse. The Department of Human Services failed to disclose the existence of the videotape in response to a discovery request. The videotape was revealed to James' attorney only five days before trial. This time was past the discovery deadline. A party who fails to respond or to supplement a response to a discovery request is not entitled to present the undisclosed evidence unless the court finds that good cause existed for the omission. TEX.R.CIV.P. 166b(6), 215(5).[5] The party offering the evidence has the burden of proof to show good cause in the record. *See Yeldell v. Holiday Hills Retirement & Nursing Center, Inc.,* 701 S.W.2d 243, 246–

Q. Okay. Are you telling me the truth, [child's name]? It's okay if you did. You're not going to get in trouble. Okay. It's not your fault. Have you ever seen anybody else do this before? (Sellers demonstrates with the dolls on top of each other.)
A. Yes.
Q. Who have you seen?
A. My daddy.
Q. Your daddy? And who?
A. My mama.
Q. Your daddy and your mama. Okay. Okay. So you saw them do that before?
A. Yes.
Q. Did they know that you saw?
A. Yes.
Q. They did. Is that where you learned to do this?
A. Yes.
Q. Okay. Okay. So you did lay on top of [your sister], didn't you?
A. Yes.
Q. Okay. (Sellers pats child on leg.) It's okay, [child's name]. It's okay that you did. Were your clothes off?
A. No.
Q. Are you sure, [child's name]? I want you to tell me the truth. Were your clothes off? You didn't do anything wrong, [child's name]. Okay? Okay, were your clothes off? (Sellers pats child on leg.) Answer me. Huh?
A. Yes.
Q. Okay. Your clothes were off. Okay. Did your wee-wee touch her poo-poo?
A. No.
Q. No. Are you sure? It's okay. Look at me, [child's name]. Did your wee-wee touch her poo-poo?
A. No.
Q. Now, are you telling me the truth? I want you to tell me the truth, [child's name]. Remember what you told me before.

5. TEX.R.CIV.P. 166b(6) is as follows:

**6. Duty to Supplement.** A party who has responded to a request for discovery that was correct and complete when made is under no duty to supplement his response to include information thereafter acquired, except the following shall be supplemented not less than thirty days prior to the beginning of trial unless the court finds that a good cause exists for permitting or requiring later supplementation.

a. A party is under a duty to reasonably supplement his response if he obtains information upon the basis of which:

(1) he knows that the response was incorrect or incomplete when made;

(2) he knows that the response though correct and complete when made is no longer true and complete and the circumstances are such that failure to amend the answer is in substance misleading; or

b. If the party expects to call an expert witness when the identity or the subject matter of such expert witness' testimony has not been previously disclosed in response to an appropriate inquiry directly addressed to these matters, such response must be supplemented to include the name, address and telephone number of the expert witness and the substance of the testimony concerning which the expert witness is expected to testify, as soon as is practical, but in no event less than thirty (30) days prior to the beginning of trial except on leave of court.

c. In addition, a duty to supplement answers may be imposed by order of the court or agreement of the parties, or at any time prior to trial through new requests for supplementation of prior answers.

TEX.R.CIV.P. 215(5) provides as follows:

**5. Failure to Respond to or Supplement Discovery.** A party who fails to respond to or supplement his response to a request for discovery shall not be entitled to present evidence which the party was under a duty to provide in a response or supplemental response or to offer the testimony of an expert witness or of any other person having knowledge of discoverable matter, unless the trial court finds that good cause sufficient to require admission exists. The burden of establishing good cause is upon the party offering the evidence and good cause must be shown in the record.

47 (Tex.1985). The only exception to the automatic sanction of disallowing undiscovered or, as here, untimely disclosed evidence is when good cause is shown why the evidence should be admitted in spite of the rule requiring disclosure. *See Morrow v. H.E.B., Inc.*, 714 S.W.2d 297, 297 (Tex. 1986); *Braniff, Inc. v. Lentz*, 748 S.W.2d 297, 299 (Tex.App.—Fort Worth 1988, writ denied).

When the videotape was offered in evidence, it was objected to because it was not disclosed in response to discovery. No evidence of good cause was presented, nor did the trial court make a determination that there was good cause for the Department of Human Services not to have disclosed the videotape. Nevertheless, the trial court overruled the objections to the videotape and admitted it. Absent a showing of good cause on the record, the trial court erred in admitting the evidence. *See Morrow v. H.E.B., Inc.*, 714 S.W.2d at 299; Tex.R.Civ.P. 215(5).

■ The Department of Human Services here argues that, while it produced no evidence of good cause, its attorney argued good cause. The determination of good cause is a decision relegated to the discretion of the trial court. *Morrow v. H.E.B., Inc.*, 714 S.W.2d at 298. Basically, the Department of Human Services argued that one of its main witnesses, Jennifer Sellers—who took the videotaped statement—no longer worked for the Department of Human Services, that the Department of Human Services had left the videotape with the police department, and that no one at the Department of Human Services knew of the existence of the videotaped statement until a week before trial. Because the ruling on James' objection is within the trial court's discretion and because the court overruled the objection, the Department of Human Services now urges that we presume that the trial court found good cause and that there is support in the record (argument on the objection) to support the court's ruling. We decline to adopt such a proposal. The court did not find good cause; had it done so, we would find an abuse of trial court discretion absent a better showing on the record that the Department of Human Services had good cause not to disclose the existence of the videotape in response to the discovery questions.

b. Hearsay statements of the children

■ Jennifer Sellers, Linda Reynolds and Virginia Reed all testified about various statements that the children who are the subject of this suit made to them. Generally, the statements were to the effect that James and Goodson committed acts which would be characterized as sexually and emotionally abusive of the children.

To be clear, the statements made were not offered pursuant to any statutory hearsay statement exception for child witnesses.[6] Neither were the statements offered under the excited utterance exception to the rule against hearsay.[7]

Hearsay is a statement made by someone not while testifying at trial, offered in evidence as proof of the matter asserted. Tex.R.Civ.Evid. 801(d). The attorneys and the trial court agreed that the children's statements to the three witnesses were hearsay. James objected to the admission of the statements on that basis. The trial court overruled the objections and admitted what the children had told the three to show the children's "state of mind." [8]

---

6. Statutory hearsay statement exceptions exist for use in juvenile court proceedings, Tex.Fam. Code Ann. § 54.031 (Vernon 1986); and in criminal cases involving child abuse victims, Tex.Code Crim.Proc.Ann. art. 38.072 (Vernon Supp.1992).

7. Tex.R.Civ.Evid. 803(2) provides: **"(2) Excited Utterance.** A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The statement would not have qualified under this exception.

8. The court gave instructions like this one given in connection with Sellers' testimony: "Any evidence received in the form of what the children may have told this witness is received solely on the question of the children's state of mind and not as proof of any matters which the children might have stated."

There is an exception to the rule excluding hearsay testimony dealing with state of mind. It is the following:

> **(3) Then Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Tex.R.Civ.Evid. 803(3). The statements of the children do not seem to relate to their state of mind at the time they made the statements.[9] However, if any of the children's statements can be said to relate to their state of mind, their state of mind is not relevant to any issue in this case. Evidence which is not relevant is inadmissible. Tex.R.Civ.Evid. 402. What is relevant about the children's hearsay statements—the conduct of James and Goodson, their parents—is not admissible. The children's statements to others describing general acts of James and Goodson are not admissible under Rule 803(3) of the Texas Rules of Civil Evidence as an exception to the hearsay rule which permits statements pertaining to one's then existing state of mind, emotion, sensation, or physical condition. Statements admitted under this exception are usually spontaneous remarks about pain or some other sensation, made by the declarant while the sensation, not readily observable by a third party, is being experienced. *Ochs v. Martinez*, 789 S.W.2d at 959. The exception does not extend to statements of past external facts or conditions. *Id.* The trial court erred in allowing the three witnesses to testify as to the content of the statements the children had made to them.

### c. Opinion as to truthfulness

 Sellers qualified as an expert witness concerning sexually abused children and testified that, among other things, the children were sexually abused.[10] The attorney for the Department of Human Services asked if she had an opinion as to what the children were telling her on the tape. She gave her opinion that they were telling

---

9. Sellers' statements were that:

 [She] told me that her father had touched her vagina, which she called her crack, with his finger, one time. She said she was wearing a pair of shorts and shirt and he pulled her shorts and underwear down and touched her crack with his finger.

 . . . .

 A. Okay. She was—where were I? He touched her crack with his finger. She then said that he made her put her hands on his wee-wee I think is what she called it, over his jeans. And then he slapped her on to the ground and walked out of the room. She also described another incidents (sic) in which she was in Mr. Goodson's bedroom and he came in and they were standing up and he again pulled down her pants and underwear and touched her vagina—well, she called it her crack—and pushed her down on to the floor and that he laid on top of her at first with his clothes on but then he pulled his jeans and underwear down and put his penis on her vagina. And that it hurt. She stated that his wee-wee was hard.

 . . . .

 A. She also described—she described 3 incidents to me. Mind you her timeframe—her frame of time—she was only I think 6 or 7. She was 8—she said she was 7 when it happened. Then she said that on another incident she couldn't remember where it was but that he made her put her mouth on his penis.

 Concerning the male child, Sellers testified that:

 [He] told me that his father had touched his penis over his pants one time in the living room and then he also described an incident in which he was in bed and his father got into bed with him and facing [him], they were facing each other in bed and that his father pulled down [his] underwear and fondled his penis.

 Reynolds testified that the female child, "talked with me about the sexual abuse from Sherman Goodson regarding that he had put his penis inside her mouth and laid on top of her and touched her private area." She said that the male child, "told me that he had seen his momma and daddy on top of each other without their clothes."

 Reed testified that, "They told me first that Sherman—is that his name—had touched them. Because we started out talking about good and bad touching. And he had touched them in places where he shouldn't."

10. It is appropriate for a qualified witness to detail traits common to sexually abused persons and to express opinions as to whether a particular person has been abused. *See Duckett v. State,* 797 S.W.2d 906, 915–17 (Tex.Crim.App. 1990); *see also* Tex.R.Civ.Evid. 702–704.

the truth. The trial court overruled James' objection to this evidence.

■■■ Opinions as to the truthfulness of another are generally not allowed. *See Duckett v. State,* 797 S.W.2d 906, 915 (Tex. Crim.App.1990); *see also* Charles Bleil, *Evidence of Syndromes: No Need for a "Better Mousetrap,"* 32 S.TEX.L.REV. 37, 57 n. 109 (1990). Sellers' opinion of the truthfulness of the children was not admissible, and the trial court erred in overruling James' objection to that testimony.

## HARM ANALYSIS/SUFFICIENCY OF THE EVIDENCE

■■■ The trial court errors in the admission of evidence were serious, and the erroneously admitted evidence is of the type that almost always is harmful. Were this a criminal case, we would certainly reverse the judgment because we could not determine beyond a reasonable doubt that the errors made no contribution to the judgment as required by TEX.R.APP.P. 81(b)(2). In this appeal, clear and convincing evidence must support the findings. We reverse if the errors were reasonably calculated to cause and probably did cause the rendition of an improper judgment. TEX. R.APP.P. 81(b)(1). The errors respecting the erroneously admitted evidence patently were reasonably calculated to cause the rendition of an improper judgment. However, under the facts of this case, we are convinced that it was the other clear and convincing evidence before the court, and not the improperly admitted evidence, that led the jury to find the facts it found.

When the improperly admitted evidence is not considered, all of the remaining evidence paints just one picture: James is mentally ill, incapable of caring for the children, and has subjected the children to conditions which jeopardize their well-being. The jury found on clear evidence that both parents had knowingly placed or knowingly allowed both children to remain in conditions or surroundings which endanger the physical or emotional well-being of such children, had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of such children, that termination of the parent-child relationship was in the best interests of the children, and that the Texas Department of Human Services should be appointed managing conservator.

Neither James nor Goodson testified. Evidence against them came from each witness who testified. The witnesses included her mother, two sisters and two older children whose father was not Sherman Goodson. While each of James' relatives did not relate all of the facts, when their testimony is taken together, it corroborates, rather than contradicts, the other evidence. Together, all the evidence clearly leads to the factual findings made by the jury.

James is mentally ill: a paranoid schizophrenic who, at the time of trial, resided in Terrell State Hospital. She has a long history of mental illness and can be both dangerous and violent. The children, who are the subject of this suit, have been sexually abused. James and Goodson routinely had sex in the presence of the children. Goodson sexually abused them in James' presence. James allowed this. The children either had sex or went through the motions of having sex in front of their parents. The two older children of James testified to having been sexually abused in the past by Goodson with their mother's knowledge. When they reported this abuse to their mother, she accused them of trying to take him from her. They also testified that Goodson and James sexually abused the younger children. Experts testified that James abused the children. All facts and matters in evidence compel a conclusion that the termination of the parent-child relationship was in the best interests of the children.

On the other hand, no evidence indicated that the children had not been abused or that termination of the parent-child relationship was not appropriate.

We conclude that the trial court errors in the admission of evidence did not cause the rendition of an improper judgment. We find that sufficient, clear and convincing admissible evidence supports the verdict and the judgment.

## JURY INSTRUCTIONS

■■■ James' attorney requested the court to submit jury questions on a counterclaim she had filed. These were nine questions dealing with whether the Department of Human Services followed the correct procedure in attempting to terminate her parental rights. The questions which James requested are not controlling. The Department of Human Services may have deviated from its own regulations and the requirements of the Adoption Assistance and Child Welfare Act of 1980.[11] This, however, has no bearing on whether there were grounds for termination and whether the termination was in the best interests of the children. The standard for review of the charge is abuse of discretion, and abuse of discretion occurs only when the trial court acts without reference to any guiding principle. *Texas Dep't of Human Serv. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). The trial court properly submitted broad-form controlling questions, as contemplated by TEX.R.CIV.P. 271–279. We find no abuse of discretion or error in failing to submit the jury questions requested by James.

We have reviewed all of the points complained of on this appeal. We find no reversible error.

The judgment is affirmed.

11. Specifically, she claims that the Department of Human Services *did not follow regulations* under 42 U.S.C.A. § 671 (West 1991).