**In the Interest of W.S., R.S., and A.S.**

**No. 2–94–151–CV.**

Court of Appeals of Texas,
Fort Worth.

May 18, 1995.

Barbara D. Nunneley, Rutledge & Nunneley, Hurst, for appellants.

Tim Curry, Crim. Dist. Atty., Betty Marshall and Charles M. Mallin, Asst. Chiefs of Appellate Section, Anne E. Swenson, Kimberly Brown, Asst. Crim. Dist. Attys., Fort Worth, for appellee.

David Flores, Fort Worth, guardian ad litem.

Before CAYCE, C.J., LIVINGSTON, J., and PATRICE M. BARRON, Former J., Sitting by Assignment.

## OPINION

LIVINGSTON, Justice.

Following a suit affecting the parent-child relationship brought by the Texas Department of Protective and Regulatory Services ("DPRS"), the court ordered termination of the parental rights of Bonnie and Dawayne Sharp to their four children, A.L., W.S., R.S., and A.S. Appellants challenge the termination of their parental rights in W.S., R.S., and A.S.[1] arguing that: 1) there was no evidence or factually insufficient evidence to support a finding that appellants knowingly placed and allowed the children to remain in dangerous conditions; 2) there was no evidence or factually insufficient evidence to support a finding that appellants engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children; 3) the admission of the videotape of A.L.'s testimony was error because the tape was inherently leading in nature; and 4) the trial court improperly commented and gave weight to Dawayne Sharp's failure to take a plethysmograph test. We affirm because there was sufficient evidence to support the findings, the trial judge did not abuse his discretion by admitting the videotape, and the trial court's findings do not indicate that the court gave weight to Dawayne Sharp's failure to take a plethysmograph.

The facts that gave rise to this case began on the evening of September 5, 1991, when

---

1. A.L. was the daughter of Bonnie, but Dawayne was not her biological father. Following the hearing, Bonnie signed an affidavit relinquishing her parental rights in A.L. Therefore, the termination of Bonnie's parental rights in A.L. is not the subject of this appeal.

Bonnie Sharp was awakened and discovered that her eight-year-old daughter, A.L., and her husband, Dawayne, were awake. A.L. was pulling up her panties, and Dawayne explained that he was watching A.L. masturbate. Later that same evening, Bonnie left A.L. and her other three children with Dawayne and went out to get some food. When Bonnie returned, she saw Dawayne getting on top of A.L. to have sex with her. Several of the other children were in the same room at the time. Bonnie called the police, and A.L. was taken to the hospital for a sexual assault examination. The results of the examination supported a finding of sexual abuse. At the time of trial, Dawayne and Bonnie were still living together as husband and wife.

The trial court found that Dawayne sexually abused A.L. on more than one occasion, Bonnie was aware of the abuse and continued to place her daughter with Dawayne, and all of the children showed signs of sexual abuse. The trial court concluded that both Bonnie and Dawayne:

> Knowingly placed and knowingly allowed the children to remain in conditions and surroundings which endangered the physical and emotional well-being of the children; and

> Engaged in conduct and knowingly placed the children with persons who engaged in conduct which endangered the physical and emotional well-being of the children.

Appellants' rights were terminated as to W.S., R.S., and A.S.

## EVIDENTIARY REVIEW

█ In points of error one and two, appellants argue there is no evidence or factually insufficient evidence to support the trial court's findings of fact that appellants endangered the well-being of their children.[2] The Texas Family Code allows for involuntary termination of parental rights where the court finds a parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or

surroundings which endanger the physical or emotional well-being of the child; or

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; [and]

> ....

> (2) termination is in the best interest of the child.

TEX.FAM.CODE ANN. § 15.02(a)(1)(D), (a)(1)(E), (a)(2) (Vernon Supp.1995).

█ Findings of fact entered in a case tried to the court are of the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing the legal or factual sufficiency of the evidence supporting a jury's answer to a jury question. *Arena v. Arena,* 822 S.W.2d 645, 650 (Tex.App.—Fort Worth 1991, no writ); *Raposa v. Johnson,* 693 S.W.2d 43, 45 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.).

### Standard of Review

█ In determining a "no evidence" point, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992); *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). A "no evidence" point of error may only be sustained when the record discloses one of the following: 1) a complete absence of evidence of a vital fact; 2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; 3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or 4) the evidence establishes conclusively the opposite of a vital fact. *Juliette*

---

2. Appellants do not challenge the trial court's findings of fact 13 and 14 that termination of their parental rights is in the best interest of the children. Unchallenged findings of fact are binding unless the contrary is established as a matter of law or there is no evidence to support the finding. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696 (Tex.1986).

*Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990).

■ Proceedings to terminate parental rights under section 15.02 of the Texas Family Code require proof by clear and convincing evidence. *See Santosky v. Kramer,* 455 U.S. 745, 747–48, 102 S.Ct. 1388, 1391–92, 71 L.Ed.2d 599, 603 (1982); *Richardson v. Green,* 677 S.W.2d 497, 499 (Tex.1984); *Swinney v. Mosher,* 830 S.W.2d 187, 195 (Tex.App.—Fort Worth 1992, writ denied). This higher burden of proof at the trial court does not, however, alter the appellate standard of review for factual sufficiency. *See Faram v. Gervitz–Faram,* 895 S.W.2d 839, 843 (Tex.App.—Fort Worth 1995, n.w.h.) (rejecting the "intermediate standard of appellate review" in cases involving the clear and convincing burden of proof); *D.O. v. Texas Dep't of Human Serv.,* 851 S.W.2d 351, 353 (Tex.App.—Austin 1993, no writ).

■ Therefore, to prevail on an assertion that the evidence supporting termination of parental rights is "factually insufficient," the evidence supporting the finding must be so weak or the evidence to the contrary must be so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination. *Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 29 (Tex.1993).

### Section 15.02(a)(1)(D)

We will first review findings of fact 9 and 10 which found appellants knowingly placed or knowingly allowed their children to remain in conditions or surroundings which endangered their physical or emotional well-being.

■ In *Stuart v. Tarrant County Child Welfare Unit,* 677 S.W.2d 273 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.), this court construed termination under section 15.02(a)(1)(D) to require evidence of a physical environment that endangered the physical or emotional well-being of the child. *Id.* at 280. This court concluded that surroundings or environment referred to the acceptability of living conditions and did not include the conduct of a parent in the home toward the child. *Id.*

A number of other appellate courts have, however, rejected this interpretation and have held that there is no reason to impose such a restriction on the plain meaning of section 15.02(a)(1)(D). *See D.O.,* 851 S.W.2d at 354–55; *In re B.R.,* 822 S.W.2d 103, 105–06 (Tex.App.—Tyler 1991, writ denied); *Smith v. Sims,* 801 S.W.2d 247, 251 (Tex.App.—Houston [14th Dist.] 1990, no writ); *In re L.S.,* 748 S.W.2d 571, 575 (Tex.App.—Amarillo 1988, no writ). These courts have concluded that the conduct of a parent in the home can produce an "environment" that endangers the physical and emotional well-being of a child as required for termination under section 15.02(a)(1)(D). *See D.O.,* 851 S.W.2d at 354–55; *In re B.R.,* 822 S.W.2d at 105–06. The Tyler court explained:

> It is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom the child is compelled to associate on a regular basis in his home, are not inherently a part of the "conditions and surroundings" of that place or home under section 15.02(1)(D).

*In re B.R.,* 822 S.W.2d at 106.

We conclude that our prior interpretation in *Stuart* was incorrect and adopt the interpretation stated by the Tyler court in *In re B.R.* Accordingly, we will look at the evidence regarding the physical environment as well as the environment produced by the conduct of Bonnie and Dawayne in reviewing the trial court's findings of fact 9 and 10.

■ At trial, the evidence of the children's living conditions indicated that Bonnie and Dawayne had the two girls sleep in their bedroom, either in the bed with them or on the floor. Bonnie and Dawayne would have sexual intercourse and perform other sexual acts on each other while the girls were in the room. The boys slept on a pallet in their grandfather's room. In addition, when the children were taken into foster care, they smelled, their hair was dirty and mussed, and their clothing was mismatched.

Sexual assault examinations of all four children revealed evidence that each of the chil-

dren had been sexually abused. Further, all of the children had behavioral and emotional problems, including sexual acting-out behaviors.

At trial, Bonnie claimed that she never left Dawayne alone with the children after she found him sexually abusing A.L. The evidence, however, shows that Bonnie left her children alone with Dawayne just hours after finding Dawayne engaged in "inappropriate" behavior where he claimed he was watching his eight-year-old stepdaughter masturbate.

Further, while Bonnie denied her knowledge of any abuse prior to the September 5, 1991 incident, she admitted to a psychiatrist during a psychiatric evaluation that other events of a similar nature had occurred. Dawayne even indicated that Bonnie had been aware of other inappropriate touching; rather than preventing Dawayne from making A.L. rub his legs, Bonnie told A.L. not to tell anyone at school "that she rubbed her daddy like that" lest they get the wrong impression.

Melanie Parsons Cleveland of the DPRS testified that she worked with appellants to develop "safety plans," arrangements to protect the children. Bonnie, however, violated the safety plans by placing the children in and allowing the children to remain in a dangerous environment. In the first safety plan, Bonnie and the children moved in with Clovis Long ("Long"), Bonnie's father.[3] Ten days later, Bonnie and the children returned to living with Dawayne, whom Bonnie had personally observed sexually abusing A.L. In the second plan, the children were placed with Latricia Sharp, Bonnie's sister-in-law, but Dawayne was allowed unsupervised visits with the children. Following appellants' failure to abide by the conditions of the second safety plan, the children were removed to foster care "due to risk of further sexual abuse."

The psychiatrist's evaluation of Bonnie concluded that she placed her needs above the needs of her children, leading him to question her ability to provide a safe environment for her children. Bonnie's own testimony at trial regarding Dawayne supported this conclusion:

[FLORES:] Is there any doubt in your mind that he did something to one of the other children?

[BONNIE:] I'm aware of the fondalation, yes. (sic) As for him ever hurting any one of the other three kids or any more than fondling, no.

[FLORES:] Why is that your conclusion?

[BONNIE:] It's not a conclusion, sir. It's just a feeling. I trust my husband. I don't feel in any way he ever hurt our kids or ever will hurt our kids, and I don't feel that he meant to hurt [A.L.].

Finally, in an interview with the child advocate, Bonnie indicated that she wished she had never turned Dawayne in and that she dropped out of the mothers' group she was attending because Dawayne did not approve of her participating. During Dr. Lembo's evaluation of Dawayne, Dawayne did not appear emotionally disturbed by the allegations of sexual abuse. Dawayne received a poor prognosis for his ability to adequately parent the children based on Dawayne's impulsivity, limited insight, and tendency to relate in a manipulative style.

Based on these facts, there is legally and factually sufficient evidence to support the findings that Bonnie and Dawayne knowingly placed or allowed their children to remain in conditions or surroundings that endangered their physical or emotional well-being.

### Section 15.02(a)(1)(E)

▇▇▇ Second, we review the sufficiency of the evidence supporting findings of fact 11 ,

---

3. At trial, Dawayne and Bonnie both blamed the sexual abuse of the children on Long. Bonnie said she never trusted him because he sexually abused her and she suspected that he had sexually abused one or more of her other children. Dawayne testified he believed Long had abused W.S. because there was an occasion when W.S.'s "anus was red" after staying at Long's house. Even though Bonnie and Dawayne claim to have suspected Long of abusing the children, there was testimony that at least some of the children were still allowed to go to Long's house with Bonnie, and at times, unsupervised. There are no findings of fact, however, addressing abuse of the children by Long or regarding Bonnie and Dawayne continuing to allow the children to visit Long.

and 12 that appellants engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. Appellants admitted having sexual intercourse and performing sexual acts on each other in the presence of the girls who slept either in appellants' bed or on the floor of appellants' room.

Dawayne admitted to fondling A.L. four or five times over a two-week period. His own statement proved he engaged in conduct that endangered A.L.:

> I have fondled my step-daughter [A.L.].... The first time I ever touched her was about a week after school started this year.... It didn't go on but for about four or five minutes. [A.L.] had a nightgown on and some panties and not every time I rubbed her vagina did she have her panties off. I did rub her vagina with my hand. I was wearing all my clothes all the times except for the last time, which was last [T]hursday night and that time I had my clothes off.... The first time it happened her panties never came off. The second time I touched her I rubbed her vagina inside her panties. I have touched her this way three or four times. The last time it happened ... [s]he took her panties off after I had been rubbing on her for a while, I rubbed her maybe half a minute before she took her panties down. She never said anything to me. She just layed there with her little eyes closed[.] I don't guess she was excited. I was not excited either. I have had her touch my penis before but only one time when her mother wasn't in the room.... I don't think she liked it. I think maybe one time she told me to stop. I may have told her one time not to tell her mother. I don't think I ever penetrated her....

Even after the incident with A.L., Dawayne continued to engage in inappropriate behavior with the children. When Dawayne would visit them, he would sit them on his lap for long periods of time, whisper to the them, and ask them if they loved him.

Further, this court has previously found that repeated abuse of one child was sufficient to terminate parental rights as to the individual's other children. *See Ziegler v. Tarrant County Child Welfare Unit,* 680 S.W.2d 674, 678 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.). Therefore, the evidence was legally and factually sufficient to support a finding that Dawayne engaged in conduct that endangered the physical or emotional well-being of all the children.

In addition to engaging in sexual activity in front of the children, Bonnie also continued to place the children in a dangerous environment. She did this by leaving the children with Dawayne the night of September 5, 1991, and by failing to enforce the safety plans for the children. Therefore, the evidence is legally and factually sufficient to support a finding that Bonnie engaged in conduct and knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the children. *See In re J.L.S.,* 793 S.W.2d 79, 81–82 (Tex.App.—Corpus Christi 1990, no writ); *Ziegler,* 680 S.W.2d at 678; *Stuart,* 677 S.W.2d at 279. Appellants' first and second points of error are overruled.

## ADMISSIBILITY OF THE VIDEOTAPE

In point of error number three, appellants argue the videotaped interview with A.L. was improperly admitted into evidence because the questioning was inherently leading, making the videotape inadmissible under the Texas Family Code. *See* TEX.FAM.CODE ANN. § 11.21 (Vernon 1986). Section 11.21 provides in part:

> (a) This section applies only to a proceeding affecting the parent-child relationship ... in which a child 12 years of age or younger is alleged to have been abused, and applies only to the statement or testimony of that child.

> (b) The recording of an oral statement of the child recorded prior to the proceeding is admissible into evidence if:
>
> ....
>
> (4) the statement was not made in response to questioning calculated to lead the child to make a particular statement.

*Id.*

The San Antonio Court of Appeals is one of the few courts to address the admissibility

of videotapes under section 11.21 where one party has sought to exclude the tapes for improper questioning. *See Ochs v. Martinez,* 789 S.W.2d 949 (Tex.App.—San Antonio 1990, writ denied) (op. on reh'g). *Ochs* involved an appeal from an order changing managing conservatorship of two children. *Id.* at 950. A videotaped interview of the four and a half-year-old child conducted by a social worker was shown to the jury. *Id.* at 951–52. Ochs challenged the admissibility of the tape under section 11.21(b)(4). *Id.*

Upon reviewing the tape, the San Antonio court "found certain questions posed by the interviewer to be leading." *Id.* at 951. Martinez, however, cited the court to common law authority and treatises for the proposition that some leading questions are permissible when examining children.[4] *Id.* at 955. The San Antonio court rejected this argument explaining that the authorities relied on by Martinez predated the enactment of section 11.21 of the Family Code. *Id.* The *Ochs* court noted that "[b]y not allowing for any leading questions in cases governed by Sec. 11.21(b)(4), the legislative branch has abrogated the common law rule insofar as the uncross-examined videotaped testimony of children under the age of 12 is concerned." *Id.* at 955–56.

The court explained that many of the questions the child was asked were leading questions that suggested a response, noting that the high number of "yes" and "no" responses given supported the conclusion that the questions were leading. *Id.* at 956. The court concluded that "questions directed to a child must be open ended and not suggestive of a response." *Id.* The court gave a sample permissible question, "What do you and Daddy do when you are alone?" *Id.* The court held it was error to admit the video to the extent that it should have been edited to exclude the leading questions. *Id.; see James v. Texas Dep't of Human Serv.,* 836

S.W.2d 236 (Tex.App.—Texarkana 1992, no writ).

While appellants failed to specify which questions may have been leading, our review of the videotaped testimony shows that most of the questions were open-ended and therefore, suggested no response from the child. *See* appendix. The numerous questions which begin with "where," "what," and "who" indicate the non-leading nature, as does the fact that most of the social worker's questions were answered with a substantive response.

Based on our review of the videotape, the trial court properly admitted the videotape, and therefore, the trial court did not abuse its discretion by admitting the tape into evidence. Further, even if the tape was inadmissible, the testimony at trial was sufficient to support the termination of appellants' parental rights. Appellants' third point of error is overruled.

## PLETHYSMOGRAPH

In point of error number four, appellants argue the trial court erred in commenting and giving weight to Dawayne's failure to submit to a plethysmograph examination. The issue of the plethysmograph was brought out at the trial because Dawayne was asked to attend sex offenders treatment, a perpetrators' group. Many of these groups, however, required members to take a plethysmograph test to gain admittance into the group. Dawayne would not take the test.[5]

Appellants' complaint centers on the following comments by the trial judge:

Looking at the docket, there has been the original hearing on 12–9–91, seven judicial reviews since this matter has been pending, and it just appears to me that that would have been time for everybody to get

---

4. The State seems to be suggesting this same argument in footnote 10 of their brief in the case before this court.

5. Dawayne attended one group session of a sex offender treatment program offered through DPRS that did not require a plethysmograph. Lisa Patterson was a group co-leader. During group, Dawayne admitted that he digitally pen-

etrated A.L. Dawayne testified that he left the group because Patterson made insulting and untrue comments about what he had done. Dawayne would not go back to this group because of the bad session with Patterson. At the hearing, Dawayne still maintained that he would go to counseling, but wouldn't take a plethysmograph.

their ducks in the pond. If at this late time I got to that impasse and that was the only way to get over the river, I would get over that river if I intended to, even if it did me in. I would have to step up at some point and do something that I didn't want to do. I personally dislike the idea of that plethysmograph, but if that's the only way to get over the river, that's the way to get over the river, so I'm going to grant it as to [A.L., W.S., R.S., and A.S.]. . . .

. . . .

. . . I'll grant it, but it seems clear that that was the only way to get around this, to get yourselves in a position to get back in line to try to get the matter straightened out, and of course, if you just bow your neck when the train is coming down the tracks and stand there, the train might come along and hit you, and apparently that's what you have done. . . .

 The trial judge did not, however, include any comments regarding Dawayne's failure to take the plethysmograph in the findings of fact or conclusions of law. Essentially, appellants appear to be asking us to view these comments as an implied finding of fact. This court will imply findings of fact in a trial to the court where no findings of fact or conclusions of law are requested or filed. *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990); *In re W.E.R.,* 669 S.W.2d 716, 717 (Tex.1984). However, in such cases, the findings of fact implied will be those necessary to support the judgment of the court. *In re W.E.R.,* 669 S.W.2d at 717.

 In *In re W.E.R.,* the court of appeals had reversed the trial court's denial of adoption. *Id.* at 716. There were no findings of fact or conclusions of law filed in the case, but the court of appeals looked at the trial judge's comments at the end of the trial and concluded that the trial judge had denied the adoption for the sole reason that the petitioner was a single male. *Id.* The Supreme Court of Texas reversed the decision of the court of appeals concluding that the court of appeals "was not entitled to look to any comments that the judge may have made at the conclusion of a bench trial as being a substitute for findings of fact and conclusions of law." *Id.* The court reiterated the rule that in cases where no findings of fact and conclusions of law are requested and filed, the judgment of the trial court is to be read to imply all of the necessary findings and conclusions to support the judgment. *Id.* at 717. Because there are findings of fact and conclusions of law filed in this case that support the judgment, we will not imply a finding of fact that the trial judge terminated parental rights because Dawayne would not take a plethysmograph. Appellants' fourth point of error is overruled.

Accordingly, the judgment of the trial court is affirmed.

## APPENDIX

[C.] The day is August un-uh, September the 6th 1991, we're at 2700 Penn Street, Fort Worth, Texas, and I have [A.L.] here with me, is that right? Do you go by [A.L.]?

[A.L.] Un-uh I just go by [A.L.].

[C.] By [A.L.], okay, how old are you [A.L.]?

[A.L.] Eight.

[C.] Do you know when your birthday is?

[A.L.] May the 7th.

[C.] Okay, alright, are you in school?

[A.L.] Uh-huh.

[C.] What school do you go to?

[A.L.] Spring Dale Elementary.

[C.] Okay, what city is that in?

[A.L.] In Fort Worth.

[C.] Fort Worth, okay, do you know your address?

[A.L.] Um, no.

[C.] Where you live, do you know your address where you live?

[A.L.] I know its something, Alt View, Alta View.

[C.] Alta View.

[A.L.] Uh-huh, I live on Alta View.

[C.] Okay, who all lives at your house?

[A.L.] My peepaw, my mom, my dad, and my brothers and sister.

[C.] Okay, what's peepaw's name?

[A.L.] They call him David.

[C.] David?

[A.L.] David.

[C.] David. Okay, what is your momma's name?

[A.L.] Bonnie.

[C.] Um, and your dad?

[A.L.] Dawayne.

[C.] Do your mom and dad have a different last name than you do?

[A.L.] My dad does.

[C.] What's his name?

[A.L.] Sharp.

[C.] Okay, and then you have brothers and a sister?

[A.L.] Yes.

[C.] What are your two brother's names?

[A.L.] [R.S.] and [W.S.].

[C.] And how old are they?

[A.L.] Well, [W.S.] is four and [R.S.] is six.

[C.] Okay, and then you have a sister too?

[A.L.] Uh-huh.

[C.] And what's her name?

[A.L.] [A.S.]

[C.] And how old is she?

[A.L.] Two.

[C.] Okay. [A.L.] do you know why you're here to talk to me today?

[A.L.] Uh-huh.

[C.] Can you tell me why you think you're here?

[A.L.] [inaudible]

[C.] Okay.

[A.L.] I went through it the other day.

[C.] Okay, you went through it the other day. Who did you talk to about this?

[A.L.] Well I talked to a policeman and I talked to another policeman, and another one.

[C.] Alright, so you talked to three policeman?

[A.L.] Uh-huh.

[C.] Okay. Did you talk to a doctor or anything?

[A.L.] Well, I talked to these two girls, I don't know their names.

[C.] Okay, where were you when you talked to them?

[A.L.] Um, I don't know, but I know I was in this—I can't say it—Peter Smith—

[C.] Peter Smith Hospital, John Peter Smith, that's the name?

[A.L.] [inaudible] ask me all these questions [inaudible].

[C.] Okay. When were you at John Peter Smith Hospital?

[A.L.] It was in the morning.

[C.] [inaudible] Do you know what time it was?

[A.L.] It was yesterday. Night.

[C.] Yesterday night [inaudible].

[A.L.] It was about two, we stayed there till one [inaudible].

[C.] In the morning?

[A.L.] No, wait, okay, we got there at one, and we stayed till about four something.

[C.] Okay. How come you had to go to the hospital?

[A.L.] Cause of what my dad done to me.

[C.] What did your dad do to you?

[A.L.] [inaudible]

[C.] [inaudible]

[A.L.] Uh-huh.

[C.] Okay. Well, let's talk about these dolls for a minute. I need you to name some body parts for me.

[A.L.] Okay.

[C.] Okay. Is this a girl or boy?

[A.L.] Girl.

782

[C.] Let me ask you this [A.L.], do you know the difference between telling the truth and telling a lie?

[A.L.] Yes.

[C.] Is it good or bad to tell a lie?

[A.L.] Bad.

[C.] What happens when you lie?

[A.L.] You get caught and stuff.

[C.] Is it good or bad to tell the truth?

[A.L.] Good.

[C.] Good. Okay. Can you promise me you'll tell me the truth?

[A.L.] Yes.

[C.] Okay, good. Can you tell me what these are on her?

[A.L.] Eyes, nose, fingers.

[C.] What do you call these?

[A.L.] Boobies.

[C.] And that?

[A.L.] Um, I forgot.

[C.] Okay. What do you call this?

[A.L.] Um, a kitty.

[C.] A yitty?

[A.L.] A kitty, but its really, um uh, I can't—

[C.] Well you can call it whatever you wanna call it. You call it a kitty?

[A.L.] Uh-huh.

[C.] Okay. So that's a kitty, what's that?

[A.L.] A butt.

[C.] Okay.

[A.L.] Oh, that's a naval.

[C.] Okay, alright, good girl. Okay is there a part of your body that someone has touched you, that you didn't like?

[A.L.] Yes, yeah.

[C.] Okay. Who, who, touched you?

[A.L.] My dad.

[C.] And his name is?

[A.L.] Dawayne.

[C.] Dawayne. Where did he touch you?

[A.L.] Down there.

[C.] Okay. Can you tell me what it's called?

[A.L.] Well we call it, cause momma won't let me call it what your suppose to, so I have to call it a kitty.

[C.] What are you suppose to call it?

[A.L.] Um, I forgot now.

[C.] So, um, he touched your kitty?

[A.L.] Uh-huh.

[C.] What did he touch it with?

[A.L.] His, um, private.

[C.] His private, okay. Is this a man or a woman?

[A.L.] Man.

[C.] Point to a private on him.

[A.L.] [Points.]

[C.] Right there, okay. What's above his lip?

[A.L.] Above his lip?

[C.] What is that?

[A.L.] A mustache.

[C.] A mustache. Do you know anyone who has a mustache?

[A.L.] My dad, kinda.

[C.] He kinda does?

[A.L.] Yeah.

[C.] Does he have any hair here?

[A.L.] He's growing some of it back.

[C.] He is. What do you call this [inaudible].

[A.L.] Well, I call it um uh, I call it his thang.

[C.] A thang?

[A.L.] Uh-huh.

[C.] Okay, and show me how it worked that he was trying to touch your kitty.

[A.L.] He was on his knees.

[C.] He was on his knees?

[A.L.] Uh-huh. My legs were on his legs.

[C.] Can you show me how with these two?

[A.L.] Un-uh.

[C.] No. Okay. Where were you, what room were you in?

[A.L.] My mom and dad's.

[C.] Mom and dad's room. Okay, were you standing up or sitting down or laying down?

[A.L.] Laying down.

[C.] And where were you laying down at?

[A.L.] On my dad's side of the bed.

[C.] On your dad's side of the bed, was anyone else in the house?

[A.L.] My peepaw.

[C.] What room was he in?

[A.L.] He was in the living room.

[C.] He was in the living room. Did he know what was happening?

[A.L.] No.

[C.] Um, so you said he was on his knees, did you have your clothes on or off?

[A.L.] Well I had my panties around here.

[C.] Around there? How did your panties get down around there?

[A.L.] My dad pulled them down there.

[C.] He pulled them down, what were you wearing?

[A.L.] Just my panties, white panties with purple stuff on them.

[C.] White panties with purple stuff on them. What's the purple stuff?

[A.L.] I don't know what it was, designs.

[C.] Designs. Did you have on a shirt?

[A.L.] No.

[C.] No.

[A.L.] Cause its hot sometimes [inaudible].

[C.] It does?

[A.L.] Well my mom opens the windows [inaudible].

[C.] What did your dad have on?

[A.L.] Or daddy.

[C.] What did your dad have on?

[A.L.] My mom's shorts, they were purple.

[C.] Your dad had on your mother's shorts?

[A.L.] [inaudible]

[C.] Okay, your dad had on your mom's shorts and they were [inaudible].

[A.L.] Yep. I think, I don't know, but I'm not sure, but I think my mom gave them to him, I don't know.

[C.] And they have what on front of them?

[A.L.] BLL

[C.] BLL

[A.L.] Bonnie Lorraine Sharp.

[C.] Bonnie Lorraine—

[A.L.] I mean, Bonnie Lorraine Long.

[C.] Long, oh, okay.

[A.L.] My mom's—well what they call my mom now is Bonnie Lorraine L. Sharp.

[C.] Okay. So did he have on a shirt?

[A.L.] No.

[C.] Okay. Do you remember what time it was?

[A.L.] Un-uh.

[C.] Is there a TV in that room?

[A.L.] No.

[C.] Had you been watching TV that day?

[A.L.] Uh-huh.

[C.] Uh-huh. Did you watch TV anytime before this happened?

[A.L.] Yeah.

[C.] What had you watched on TV?

[A.L.] I was watching America's Most Wanted.

[C.] America's Most Wanted?

[A.L.] Uh-huh.

[C.] Where was your mother when it happened?

[A.L.] In the bedroom.

[C.] She was in the bedroom when it happened?

[A.L.] Asleep.

[C.] Which bedroom?

[A.L.] My mom and dad's.

[C.] Okay. When your dad touched your kitty, your mom was in the room?

[A.L.] But my mom was asleep.

[C.] She was, okay. So where do you usually sleep?

[A.L.] I sleep on the floor.

[C.] In their room.

[A.L.] Uh-huh.

[C.] Okay, but you were on the bed?

[A.L.] Uh-huh, when, my dad, yeah.

[C.] Okay. So where were your brothers and sister?

[A.L.] My sister was laying on the—was laying on the floor, laying, my other two brothers I guess they were asleep.

[C.] Okay. Were they in the same room or different room?

[A.L.] Different.

[C.] Okay.

[A.L.] They were in the room where my peepaw sleeps.

[C.] Okay.

[A.L.] See, here's our bedroom right here, there's his bedroom and right here there's just a closet.

[C.] Okay. So your mom's in the bed?

[A.L.] Uh-huh.

[C.] She's asleep? What does she have on?

[A.L.] A shirt and shorts.

[C.] Okay. She's asleep and you don't have anything on but your panties?

[A.L.] Uh-huh.

[C.] Your white with purple designs?

[A.L.] Uh-huh.

[C.] And your dad has purple shorts on with BLL on them?

[A.L.] And white, he has white around here.

[C.] Okay. And then what does he do? Does he say anything to you?

[A.L.] No.

[C.] Did he tell you to be quiet?

[A.L.] Yeah.

[C.] Okay. Did um—he—you said he took your panties off?

[A.L.] Uh-huh.

[C.] Who took his clothes off?

[A.L.] He did.

[C.] He did. Did he take them all the way off?

[A.L.] Uh-huh.

[C.] Okay. Did he have underwear on or anything?

[A.L.] Un-uh.

[C.] Did you see this?

[A.L.] Uh-huh.

[C.] Was it hard or soft?

[A.L.] I don't know.

[C.] Did you touch it?

[A.L.] No.

[C.] Okay. Did this part of him touch any part of your body?

[A.L.] Uh-huh.

[C.] Where?

[A.L.] Down there.

[C.] Okay, uh, has anybody ever put their fingers in there?

[A.L.] Uh-huh.

[C.] Who?

[A.L.] My dad.

[C.] Okay. Did uh—how did it feel?

[A.L.] It hurt.

[C.] Did you tell him it hurt?

[A.L.] Yes.

[C.] What did he say?

[A.L.] He said, okay, he kept saying its okay, its okay.

[C.] Okay. Is this the first time that this has happened?

[A.L.] No.

[C.] No, no it isn't. Okay. So, um, he, he has touched you there, has anybody ever put their mouth down there?

[A.L.] Uh-huh.

[C.] Who?

[A.L.] My dad.

[C.] What did he do when he put his mouth down there?

[A.L.] I don't know, but I know he has.

[C.] Have you ever had to touch this at all, with anything?

[A.L.] Uh-huh.

[C.] What?

[A.L.] My hand.

[C.] Okay. Does stuff ever come out of the end of it when you touch it?

[A.L.] Sometimes.

[C.] Where does it go?

[A.L.] What?

[C.] Where does it go when it comes out of it?

[A.L.] I—I don't know.

[C.] Do you know what it looks like?

[A.L.] No. Cause my dad, he puts the light on first where [inaudible] light and you can't see [inaudible].

[C.] He puts the light on when its first light?

[A.L.] It's kind of like dim, where you can't see but a shadow, can't see—

[C.] Okay. I see, okay, so this isn't the first time this has happened?

[A.L.] No.

[C.] How old were you when it first happened?

[A.L.] About my age right now. Eight years old.

[C.] Okay. And the first time it happened where was it? Where did it happen?

[A.L.] The same place.

[C.] Was your mommy [inaudible].

[A.L.] No.

[C.] Where was she at?

[A.L.] I think she was in the living room.

[C.] Well did you tell your mom?

[A.L.] No.

[C.] You didn't?

[A.L.] Un-uh.

[C.] Okay.

[A.L.] [inaudible] my dad.

[C.] Why did he say not too?

[A.L.] He said don't tell your mom or he's gonna be in deep, deep, deep trouble and so will I. But I didn't want him to but he went ahead.

[C.] He went ahead and what?

[A.L.] And did it.

[C.] Oh okay. So how come this time your mom found out about it?

[A.L.] See she—I didn't want to do it no more [inaudible] to stop, but my mom almost left the door open about that much she walked in and she seen my dad curled up like that and um she um and then she said um come here dad, which is my, my peepaw, so then he walked in there then after he looked he went back and I guess he started laughing.

[C.] Why did he think it was funny?

[A.L.] I don't know.

[C.] Did you think it was funny?

[A.L.] No.

[C.] I thought you had said that your mom was in bed with you.

[A.L.] She was and then and then she got up and then my dad told her to go get something to eat. French Fries and gatorade.

[C.] At the store?

[A.L.] And gatorade.

[C.] At the store or something?

[A.L.] No, at um Jack-in-the-Box to get some french fries [inaudible] 7–11 to get some gatorade and then she came back.

[C.] That's what—when this happened?

[A.L.] Uh-huh.

[C.] Okay—um.

[A.L.] Then after that they started getting into a big argument and my mom got scratched.

[[A.L.] talks same time as [C.] says something about mom's finger being scratched.]

[C.] So after she found out that this happened then what did she do?

[A.L.] She—after she, she said come on [A.L.] lets go, and she got me up [inaudible] and never did get out, get out of there until my dad went back and got my sister we got in the car and we were fixing to leave and my dad said "Give me a chance, one more chance," he kept repeating that. Cause my, cause um, my dad said "I gave you chances, I gave you chances."

[C.] Oh, so did—

[A.L.] But, I, I don't know what chances my dad's gave her.

[C.] So did your, did your two brothers and sister stay there with your dad?

[A.L.] Well, no, see they're, see um, my dad, [inaudible] my mom left but I wasn't with her. I got [inaudible] my dad started saying, "Well you want your dad to go to jail don't you?" I kept, I didn't say nothin' and when the police got there, my dad kept, well first my dad told my momma a lie.

[C.] What did he say?

[A.L.] Cause I, okay, I was right here and my dad was right there [inaudible] she said "what are you doing," she said "where's, where's daddy, where's your daddy [A.L.]?" and the third time he said "here I am," and she said "what are you doing down there?" he said "I, what is she doing down there?" he said, "I don't know," and he lied.

[C.] He lied cause he knew what you were doing? And what were you doing?

[A.L.] The same thing we was doing on the bed.

[C.] Has this ever gone all of the way inside of you?

[A.L.] Almost.

[C.] Almost?

[A.L.] Well, one time it already has.

[C.] Okay. Has anybody ever touched you back here on your butt?

[A.L.] Un-uh.

[C.] No. Um, you said you've had to touch this with your hand?

[A.L.] Uh-huh.

[C.] Have you ever had to touch it with anything else?

[A.L.] No.

[C.] No, never had to touch it with your mouth? Okay, do you know if anything like this has happened to your brothers or sister?

[A.L.] Not that I know of. Cause all my dad goes, all my dad does is goes you better get to sleep or I'll get Marge [inaudible].

[C.] You better get to sleep so can do what?

[A.L.] Frighten, or I'm gonna get Marge [inaudible], scares my sister, and she makes, makes her scream.

[C.] Why does he make her scream?

[A.L.] Cause, cause every night he does, this here he comes, here he comes.

[C.] How many times do you think that this has happened to you?

[A.L.] Several.

[C.] More than once?

[A.L.] Uh-huh.

[C.] More than three times?

[A.L.] Yeah, I know.

[C.] How bout more than five?

[A.L.] Uh-huh.

[C.] Okay.

[A.L.] I don't, don't know over five.

[C.] The first time it ever happened were you in school, or was it summertime, or was it around Christmas, do you remember?

[A.L.] Um, I just got here about two— five weeks ago.

[C.] Got here from where?

[A.L.] From Honey Grove.

[C.] From Honey Grove, okay.

[A.L.] And see um—

[C.] Does it always happen in the same place? Does it ever—

[A.L.] No, but sometimes, see um, see uh, when I got here about a month after that's when it started happening here, I've been here about three or four months now.

[C.] Does it always happen in the same room?

[A.L.] No, yeah, yeah in the same room, yes.

[C.] Does it always happen in the house, does it ever happen when you are out somewhere else? [inaudible]

[A.L.] [Shakes head no.]

[C.] Well, I'm gonna talk to your dad, is there something that you'd like for me to say to him for you?

[A.L.] No.

[C.] No.

[A.L.] But, I know my mom would.

[C.] I sure do appreciate you talking to me, okay?

[A.L.] Uh-huh.

[C.] Alright.