

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-14-00274-CV

IN THE INTEREST OF C.W., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-98887J-13

----------

## MEMORANDUM OPINION[1]

----------

Appellant M.E.G. (Mother) appeals the termination of her parental rights to

her child, C.W.  We affirm.

### Background Facts

Mother and C.W.'s father (Father) lived together with Mother's older child,

L.M.  Mother shared custody of L.M. with his biological father, R.M., with each

parent having possession of L.M. fifty percent of the time.  Mother gave birth to

----

[1]*See* Tex. R. App. P. 47.4.

C.W. in late July 2013. Hospital records show that a social worker interviewed Mother shortly after she had given birth. The social worker's assessment from the hospital noted that Mother was "polite but [did] not engage easily." The social worker described Mother as having a flat affect and withdrawn mood. Mother stated that she had not known she was pregnant until she was about six months along. She had her first prenatal visit on June 6, 2013, when she was thirty-three weeks pregnant and had tested positive for methamphetamines. Mother did not return for a checkup until July 24, 2013 because "she was out of town and had 'stuff' going on."

Mother denied drug use to the social worker and stated that "she had a root canal 'or something' and that she [had taken] meds for it." Mother's mother (Grandmother) told a nurse at the hospital that Mother and Father "fight a lot and it's a 'bad situation.'" Grandmother stated that she had brought Mother in on July 24 because Mother was depressed.

C.W.'s medical records note that Mother or her family members had taken C.W.'s diapers and had hid them in takeout containers that they wrapped in a bag and then put in the trash so that the hospital could not drug test C.W.'s meconium.[2] A nurse found the diapers, and the hospital was able to test C.W.'s

---

[2]C.W.'s medical records explain, "Meconium begins to form between the 12th and the 16th week of gestation. Meconium drug testing can detect maternal drug use during the last 4 to 5 months of pregnancy."

2

meconium. It tested positive for methamphetamine. The social worker contacted the Department of Family and Protective Services (DFPS or the Department).

Lacey Gentry, a DFPS investigator, visited Mother in the hospital after she had given birth. Mother denied all illegal drug use. She told Gentry that she had taken a "pain pill" for a root canal that she had, but Mother could not tell Gentry where she had gone for the procedure. Mother agreed to go for a hair follicle test, but she did not follow through. Gentry later drug tested Father, and his results were positive for methamphetamine.

The Department found reason to believe that Mother and Father were neglectful in their supervision and removed C.W. and L.M. from the home. Gentry testified that when she went to Mother's home to remove the children, those present in the home would not let her in. Gentry had to return with police officers. Gentry said,

> [T]hey were hiding the baby in the kitchen in the bouncer. And then we asked to see the baby, and they said that's not the baby. Obviously, it was the baby. And then there was also a door locked in the home, and they wouldn't let me behind the door.
>
> I asked if [Mother] and [Father] were behind the door, and everyone kept saying no, but no one really knew where they were. They were calling [Mother] and [Father], and they weren't wanting to come to the home.

Once the children were removed, Gentry tried contacting the parents about placement options, but they refused to answer Gentry's calls. Gentry was eventually able to contact L.M.'s father and placed L.M. with him.[3]

DFPS filed its petition for termination in August 2013 against both Mother and Father. In September 2013, DFPS gave Mother a family service plan. Mother signed an acknowledgment-of-substance-use form acknowledging using methamphetamine and amphetamine on September 12, 2013.

After a bench trial, the trial court found that Mother had knowingly placed or knowingly allowed C.W. to remain in conditions or surroundings that endangered his physical or emotional well-being; that she had engaged in conduct or had knowingly placed C.W. with persons who had engaged in conduct that endangered his physical or emotional well-being; that she had constructively abandoned C.W.; and that termination of Mother's parental rights to C.W. was in his best interest.[4] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (2) (West Supp. 2011). This appeal followed.

## Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights,

---

[3]After placing L.M. with his father, the Department nonsuited as to L.M. Mother's rights to L.M. are not involved in this appeal.

[4]The trial court also terminated Father's parental rights to C.W. He is not a party to this appeal.

privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's

actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.,* 437 S.W.3d 498, 500 (Tex. 2014). In

6

reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D), (E), or (N) of section 161.001(1) and the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(D), (E), (N); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

**Discussion**

In three issues, Mother challenges the legal and factual sufficiency of the evidence to support the grounds for termination. Mother's first two issues challenge the sufficiency of the evidence supporting the trial court's endangerment findings.

7

## I. Endangerment grounds

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id.* at 776–77; *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Under (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the

8

parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct. *See R.W.*, 129 S.W.3d at 739.

## II. The evidence

Mother testified that she started using methamphetamines in November 2012 and was introduced to the drug by friends of hers and Father. She said that she last used methamphetamines on April 2, 2014, three months before trial. She said she had smoked methamphetamine "[j]ust off and on, a year and a half." She testified she only used drugs about twice a month. She admitted that after C.W.'s birth, she "occasionally" used drugs. Mother did not recall admitting to her caseworker that she had used drugs, and after looking at the drug use admission form, she said that the signature on the form was not hers.

Mother testified that she has been attending NA and AA meetings three times per week since September 2013. She admitted that she had used "a

9

handful" of times since starting NA and AA. She said she had completed all twelve steps, but she had never had a sponsor. She testified that she never completed her drug assessment at Recovery Resource and denied that she needed help addressing her drug use.

Mother testified that during the period she was using drugs, her nine-year-old son, L.M., was living with her. She described L.M. as a happy and healthy honor-roll student whom she supported physically, emotionally, and financially. She testified that he was never in the house when she used drugs. L.M.'s father testified that he was concerned that Mother was still using drugs. He said that when L.M. came to live with him after being removed from Mother's care, there were problems with L.M. being at school on time, missing school, and being properly dressed. L.M.'s father testified that he corrected those problems once L.M. was in his care. L.M.'s stepmother also testified that she had concerns regarding Mother's ability to take care of her children.

Ashely Dabbs, a DFPS conservatorship worker, testified that she had been unable to drug test Mother throughout the case because she could not contact Mother and because Mother had not completed the drug testing as required by her service plan. Mother did not provide Dabbs with proof that she had been attending AA or NA meetings. Dabbs testified that she has received nothing that would indicate that Mother is no longer using drugs and that Mother has not demonstrated that she can care for C.W.'s needs. Dabbs believed that Mother's ongoing drug use was a danger to C.W.'s emotional and physical health.

Tyra Sasita, a DFPS supervisor, testified that Mother told her that she was using methamphetamines on a weekly basis and that she continued to use drugs after she found out she was pregnant with C.W. Sasita tested Mother for drugs six times at Mother's visits with C.W. Four weeks in a row, Mother tested positive for methamphetamine. Sasita testified,

> I had a very extensive talk with [Mother] in regards to usage, because of the concern that I had during our meeting was that she continued to downplay her usage, and I wanted to express to her how serious the drug methamphetamines is and that she may truly have a desire to stop, but if she does not get any formal tools to aid her in, it's going to be very, very hard.

Sasita said she had concerns based on what Mother had claimed to do to maintain sobriety. She said, "The concern that she is a frequent user, and if she has managed to stop using cold turkey, so to speak, without any help would surprise me." Sasita was also concerned that Mother did not have an AA or NA sponsor. She said,

> It concerns me because on her service plan it states that she should get a sponsor, and she should provide that name and information to the Department. But it also concerns me that absent . . . [DFPS] involvement, NA and AA programs highly recommend that you have a sponsor to walk with you during your walk of recovery.

Sasita said, "If she is clean today, it would surprise me that she has done it without the aid of formal drug treatment." Sasita acknowledged, however, that it is possible. She explained,

> The overall concern that I have in this case and why the Department is recommending or—the recommendation is termination is because there has been a lack of significant change

11

with [Mother]. . . . She has not completed the service plan. It seems that [Mother] has several different excuses for why she has not completed the service plan . . . .

## III. Sufficiency of the evidence to support the endangerment grounds

Mother argues that the evidence is insufficient to support the endangerment findings because she stopped using drugs when she became aware of her pregnancy. Mother likens her case to that of the appellant mother in *In re M.G.P.*, No. 02-11-00038-CV, 2011 WL 6415168, at *10–11 (Tex. App.— Fort Worth Dec. 22, 2011, pet. denied) (mem. op.). In that case, we held that the mother's use of cocaine during her first month of pregnancy, before she knew she was pregnant, was legally insufficient to support termination under subsection (E). *Id.* However, in that case, the mother ceased her drug use when she discovered her pregnancy, stayed drug-free for the two years leading to trial, and completed her service plan "in order to prove that she did not have a substance abuse problem." *Id.* at *11. In this case, there was conflicting testimony regarding whether Mother continued to use drugs after discovering her pregnancy, evidence by way of drug tests after C.W.'s birth and Mother's own admissions that she continued to use drugs after C.W.'s removal, and testimony that Mother failed to demonstrate to her caseworkers that she had sufficiently addressed her substance abuse problem.

Mother also argues that there was no scientific evidence introduced showing that the level of drugs in C.W.'s meconium was a harmful or endangering level. The assumption underlying Mother's argument is that there is

12

some level of drug use while pregnant that is acceptable or harmless to the child. We decline to support such a premise. We likewise decline to hold that the lack of expert testimony regarding the significance of the drug test results prevents the trier of fact from considering the results as evidence of endangerment. *See J.T.G.*, 121 S.W.3d at 125 (holding that parental drug use may support endangerment findings under (D) and (E)); *see also In re M.D.V.*, No. 14-04-00463-CV, 2005 WL 2787006, at *3 (Tex. App.—Houston [14th Dist.] Oct. 27, 2005, no pet.) (mem. op. on reh'g) ("[W]e reject the suggestion that a baby born with the abnormal condition of marijuana in her system has not been harmed simply because there is no evidence of further medical effects. . . . Here, appellant's drug use while pregnant endangered M.D.V. because she was exposed to the possibility of being born with adverse medical conditions.").

Finally, Mother argues that the State did not present evidence that C.W.'s urine tested negative for drugs shortly after birth,[5] which test Mother argues "conflicts" with the positive meconium test. However, both C.W.'s urine and meconium tests were submitted into evidence with the rest of C.W.'s medical records for the trial court to consider. Further, Mother testified that she had used drugs until her fifth month of pregnancy and then stopped, which could account for the positive meconium test and negative urine test.

---

[5]C.W.'s first urine was not caught for testing. The test was done on C.W.'s second urine. The test results state that the sample was "[a]bnormally dilute."

13

The evidence was that Mother used drugs while pregnant with C.W., continued to use drugs after his removal, failed to use the formal recovery programs offered to her, and denied that she needed help addressing her drug use. *See In re Z.D.*, No. 02-07-00386-CV, 2008 WL 4354936, at *7 (Tex. App.—Fort Worth Sept. 25, 2008, no pet.) (mem. op.) ("A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children."). Although she testified that she frequently attended AA and NA meetings, she also admitted to using drugs while in the AA/NA program and did not have a sponsor to support her. And although she claimed to be drug-free for the three months before trial, she had used drugs for over a year before. *See In re C.C.*, No. 13-07-00541-CV, 2009 WL 866822, at *11 (Tex. App.—Corpus Christi Apr. 2, 2009, no pet.) (mem. op.) (holding that record did not support mother's characterization of a recent turnaround when "the undisputed evidence showed that she had failed to alleviate the main concern underlying the children's removal"). A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.); *see also Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.) ("[I]n considering the best interest of the child, evidence of a recent turn-around in

14

behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past."). Further, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). The trial court weighed the credibility of Mother's testimony that she had not used drugs for three months and could have disbelieved that claim or could have believed that there was a serious concern that Mother would relapse back into drug addiction. *See In re J.D.B.*, No. 02-06-00451-CV, 2007 WL 2216612, at *3 (Tex. App.—Fort Worth Aug. 2, 2007, no pet.) (mem. op.) (noting that a factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent); *In re C.S.C.*, No. 02-06-00254-CV, 2006 WL 3438185, at *7 (Tex. App.—Fort Worth Nov. 30, 2006, no pet.) (mem. op.) (same).

The clear and convincing evidence supports the trial court's finding that the environment provided for C.W. under Mother's care endangered his physical or emotional well-being. Further, the clear and convincing evidence supports the trial court's finding that Mother engaged in a course of conduct that endangered C.W. Accordingly, we hold that the evidence is both legally and factually sufficient to support the trial court's termination findings under subsections 161.001(D) and (E). We overrule Mother's first and second issues. Because, along with a best-interest finding, a finding of only one ground alleged under section 161.001(1) is necessary to support a judgment of termination, we need

15

not address Mother's remaining issue.  *See* Tex. R. App. P. 47.1; *see also In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.); *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.).

## Conclusion

Having overruled Mother's first and second issues and having determined that we need not reach her third issue, we affirm the trial court's judgment.

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL:  LIVINGSTON, C.J., WALKER and GABRIEL, JJ.

DELIVERED:  December 12, 2014

16