In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00010-CV


______________________________




IN THE INTEREST OF


L.F.B., A CHILD




 


On Appeal from the 62nd Judicial District Court


Franklin County, Texas


Trial Court No. 10,075




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Moseley



MEMORANDUM OPINION



 Larry and Rosemary Cade appeal the order terminating their parental rights to their daughter,
L.F.B.

I. FACTUAL AND PROCEDURAL BACKGROUND

 The trial court heard evidence that presented the following events leading up to the
termination of Larry's and Rosemary's parental rights: Larry and Rosemary had a daughter, L.F.B.,
on August 4, 2004. The record indicates that because Verna (1) was unable to bear children while
Rosemary was quite fertile, Rosemary would give birth to a child for Verna to have and raise as her
own. In accord with this agreement, nine days after L.F.B. was born, Rosemary signed and notarized
a statutory power of attorney granting custody and control of L.F.B. to Verna, this power of attorney
stating in part: 

 I have recently given birth to an infant female child named [L.F.B.] on August 4,
2004 and I have given physical custody of said child to the attorney-in-fact [Verna]. 
I hereby grant to my attorney-in-fact all the authority and power that I have as the
natural mother of [L.F.B.] to make all decisions of every conceivable kind and nature
appropriate to the care, feeding, supervision and medical and dental needs of said
child.


 . . . .


 Unless you direct otherwise above, this Power of Attorney is effective immediately
and will continue until it is revoked.


 This Power of Attorney will continue to be effective even though I become disabled,
incapacitated, or incompetent.

Shortly after L.F.B.'s birth, Verna separated from her husband; in September or October 2004, she
moved in with Larry and Rosemary in Mount Vernon, bringing with her both L.F.B. and Verna's
boyfriend, Jonathan. 

 After Jonathan attempted suicide by overdosing on drugs and demonstrated other worrisome
behavior, Larry became concerned with his own safety and insisted that Jonathan move out of the
house in December 2004. Jonathan complied with the demand, and he, Verna, and L.F.B. removed
themselves from Larry's home, establishing another residence together in Mount Vernon. 

 On February 20, 2005, Verna called Rosemary to ask Rosemary to come over and pick up
L.F.B. At that particular time, Larry was plying his trade as a truck driver and was away from the
area. Rosemary responded by going to Verna and Jonathan's residence, where she discovered that
Jonathan had stabbed Verna and left. Rosemary took Verna and L.F.B. from the house and took
Verna to obtain medical attention. Later, it was discovered that, after having stabbed Verna,
Jonathan had also stabbed himself several times about the chest and neck. 

 For less than a week following the stabbings, Rosemary and Larry took custody of L.F.B. 
However, after this short period of time, Rosemary returned L.F.B. to Verna at the house Verna
shared with Jonathan. Soon after, Verna, L.F.B., and Jonathan moved to Smithville, near
Georgetown. On March 9, 2005, while Verna and Jonathan were in Smithville, the Texas
Department of Family and Protective Services (the Department) contacted them regarding reports
of neglectful supervision and physical abuse of the now seven-month-old L.F.B. On March 16,
2005, the Department removed L.F.B. from the custody of Verna and Jonathan in Bastrop County
and placed L.F.B. in foster care near Franklin County. 

 The Department officials learned that Verna was not the natural mother of L.F.B. and became
aware that Rosemary had executed the statutory power of attorney, which had been intended for the
purpose of granting Verna the custody of L.F.B. The Department representatives contacted Larry
and Rosemary following the removal of L.F.B from Verna's home. After unsuccessful attempts to
reunite L.F.B. with Larry and Rosemary, the Department sought termination of parental rights of
Verna, Larry, and Rosemary. In a trial to the bench, the trial court found by clear and convincing
evidence that certain grounds alleged as a basis for the termination of parental rights existed and that
termination of their parental rights would be in the best interest of L.F.B. Larry and Rosemary now
appeal from the trial court's order of termination.

II. PRESERVATION OF ERROR

 A. Issues Raised by Larry and Rosemary's Joint Brief 

 Larry and Rosemary specifically raise the issue of abandonment: "Termination of parental
rights should be reversed because appellants did not abandon the child." They also specifically raise
the issue regarding the degree to which they failed to comply with the Department's family service
plan: "Termination of parental rights should be reversed because appellants' non-compliance with
the service plan was not so egregious as to warrant termination."

 Though they do not specifically raise the issue in their second point of error, Larry and
Rosemary also cite and discuss Section 161.001(1)(D) as a basis for termination of their parental
rights. Section 161.001(1)(D) provides that termination of parental rights can be based on clear and
convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in
conditions or surroundings which endanger the physical or emotional well-being of the child." Tex.
Fam. Code Ann. § 161.001(1)(D) (Vernon Supp. 2006). In support of their challenge, Larry and
Rosemary contend on appeal that the only reason they allowed L.F.B. to return to Verna was that
Verna threatened to kill anyone who interfered with custody of L.F.B. We conclude that Larry and
Rosemary's joint brief can be fairly read to raise the issue of whether the evidence is sufficient to
support the conclusion that they knowingly placed or allowed L.F.B. to remain in surroundings that
endangered her physical or emotional well-being. See Tex. R. App. P. 38.1(e). 

 We now turn to their statements of points on appeal to determine whether these issues were
properly preserved for our review pursuant to Section 263.405 of the Texas Family Code. See Tex.
Fam. Code Ann. § 263.405(i) (Vernon Supp. 2006). 

 B. Statements of Points on Appeal

 Larry and Rosemary filed separate motions for new trial in which each included a statement
of points on appeal. See Tex. Fam. Code Ann. §§ 263.405(b), (i) (Vernon Supp. 2006). In his
statement of points on appeal, Larry presented the following two points:

 Movant challenges the sufficiency of the evidence produced to support an
affirmative finding that Larry Cade's parental rights be terminated and the Court erred
in granting termination as this was against the great weight and preponderance of the
evidence presented by Movant.


 . . . .


 Movant alleges that he was not responsible for any of the events that allegedly
put the child in danger. Movant was out of town when the stabbing incident occurred
whereby his sister-in-law was injured while the child was in her custody. Because
of his work schedule, he was not aware of incidents whereby his child was allegedly
put in danger.


In her statement of points on appeal, Rosemary also presented two points:

 Movant challenges the sufficiency of the evidence produced to support an
affirmative finding that Rosemary Cade's parental rights be terminated and the Court
erred in granting termination as this was against the great weight of the evidence
presented by Movant.


 . . . . 


 Movant alleges that she was not responsible for any of the events that
allegedly put the child in danger. Movant was not present with the child when the
stabbing incident occurred, and later was threatened by the sister-in-law to not
interfere with the child.

Larry and Rosemary each presented a general challenge to the sufficiency of the evidence and then
presented a more specific statement in each of their separate second points. We must now determine
whether their statements of points on appeal preserve for our review the particular issues presented
in their joint brief to this Court. See In re D.A.R., 201 S.W.3d 229, 230 (Tex. App.--Fort Worth
2006, no pet.).

 1. First Point in Statements of Points on Appeal Fails to Preserve Any Issue for
Appellate Review


 Both Larry's and Rosemary's first point in their statements of points on appeal fails to
preserve anything for our review. Section 263.405 definitively states that a general statement that
challenges the sufficiency of the evidence is insufficient to preserve the issue for appeal. See Tex.
Fam. Code Ann. § 263.405(i); In re A.C.A., No. 13-05-00610-CV, 2006 Tex. App. LEXIS 3759
(Tex. App.--Corpus Christi May 4, 2006, no pet.) (mem. op.). That said, we concentrate our
analysis on their second points made in their statements of points on appeal. The issue then becomes
whether their second points are sufficient to preserve their three issues presented in their brief to this
Court.

 2. Abandonment Issue

 In their brief, Larry and Rosemary contend that there was insufficient evidence to support a
finding that they abandoned L.F.B. and outline the requirements of Section 161.001(1)(A). (2) 
Although constructive abandonment under Section 161.001(1)(N) (3) was alleged as grounds for
termination of both Larry's and Rosemary's parental rights, abandonment under Section
161.001(1)(A) was not alleged. Nor was abandonment--either constructive or actual--the ground
for termination of parental rights in this matter. This issue regarding whether the statements of
points on appeal preserved this issue for appeal is, therefore, irrelevant, and we do not reach that
issue. We conclude that any issue concerning the evidence to support a finding of abandonment
under Section 161.001(1)(A) is not before this Court.

 3. Noncompliance Issue

 Neither Larry's nor Rosemary's second point in their statements of points on appeal mentions
any issue regarding the degree of noncompliance with the service plan. That said, we conclude that
the first issue raised in their brief to this Court was not preserved for our review. See Tex. Fam.
Code Ann. §§ 161.001(1)(O), 263.405(i).

 4. Issue of Knowing Placement in Endangering Surroundings

 We now turn to the issue of whether clear and convincing evidence supported the finding that
Larry and Rosemary knowingly placed or allowed L.F.B. to remain in conditions or surroundings
which endangered her physical or emotional well-being. Since Larry's and Rosemary's second points
in their motions for new trial differ, we will address each separately to determine whether their
statements preserve this issue for appellate review.

 We restate the relevant point asserted in Larry's statement of points on appeal:

 Movant alleges that he was not responsible for any of the events that allegedly
put the child in danger. Movant was out of town when the stabbing incident occurred
whereby his sister-in-law was injured while the child was in her custody. Because
of his work schedule, he was not aware of incidents whereby his child was allegedly
put in danger.


By asserting that Larry was unaware of the events or conditions which endangered L.F.B., the final
statement in Larry's second point can be fairly read to raise the issue regarding whether he knowingly
placed or allowed L.F.B to remain in dangerous surroundings. See Tex. Fam. Code Ann.
§ 161.001(1)(D).

 We also restate Rosemary's second point in her statement of points on appeal:

 Movant alleges that she was not responsible for any of the events that
allegedly put the child in danger. Movant was not present with the child when the
stabbing incident occurred, and later was threatened by the sister-in-law to not
interfere with the child.


Similarly, Rosemary's second point can be read to raise the issue regarding whether she knowingly
allowed L.F.B. to remain in conditions which endangered her physical or emotional well-being. 
Rosemary's second point asserts that she was not present when the stabbing incident occurred and
also suggests that she only allowed L.F.B. to remain in the household with Verna and Jonathan due
to the fact that Verna had threatened Rosemary's life if Rosemary interfered with Verna's possession
of L.F.B. Reading her point quite liberally, we conclude that Rosemary also preserved the issue of
whether clear and convincing evidence supported the finding that Rosemary knowingly allowed
L.F.B. to remain in dangerous conditions. 

III. ANALYSIS

 We have narrowed the issue preserved for our review to whether sufficient evidence supports
the finding that Larry and Rosemary knowingly placed or allowed L.F.B. to remain in conditions or
surroundings which endangered her well-being. (4) From their brief, it appears that Larry and
Rosemary do not contend that the surroundings in Verna and Jonathan's household did not endanger
L.F.B.'s physical or emotional well-being. Rather, it seems, Larry and Rosemary contend that they
lacked the awareness of those conditions or surroundings and, therefore, did not knowingly place or
allow L.F.B. to remain in those conditions. The record, however, indicates otherwise. To illustrate,
we examine four distinct phases of Larry's and Rosemary's interactions with Verna and Jonathan as
they relate to the custody of L.F.B. 

 A. Giving Verna Custody of Newborn L.F.B.

 The record shows that Verna was not residing with Jonathan at the time Verna was first given
custody of L.F.B. However, Rosemary testified that she was aware that Verna had a history of drug
abuse, particularly an addiction to methamphetamine. Rosemary testified that she did not know
whether Verna was using methamphetamine when Verna was given custody of L.F.B. 

 Rosemary also testified that she knew that her children from a former marriage may have
been sexually abused in California (5) and that Verna was one of the potential suspects in that case of
sexual abuse. Rosemary explained that she did not know exactly who had sexually abused her
children in California because the California authorities would not provide her a clear answer as to
the identity of the offender. When a parent is aware that her children were in surroundings which
posed a risk of sexual abuse and disregarded that risk, such knowledge and disregard of the risks may
represent evidence that the parent knowingly placed or allowed a child to remain in surroundings that
endangered the child. See In re A.B., 125 S.W.3d 769, 775 (Tex. App.--Texarkana 2003, pet.
denied). Here, the Department employees testified that California records showed that a no-contact
order had been issued against Verna as a result of the investigation into the welfare of those older
children. While the children at issue in the prior investigation were not at issue here, Rosemary's
knowledge that Verna was the subject of a no-contact order pertaining to other children lends support
to the finding that Rosemary knowingly placed L.F.B. in dangerous surroundings. 

 B. Removing Jonathan from the House

 Although Larry testified that he was only aware of the power of attorney after it had already
been prepared and signed and correctly points out that he did not sign the document, his role became
more significant when Jonathan, Verna, and L.F.B. came to live with him and Rosemary. Larry
explained that he became terribly concerned about Jonathan's behavior, his concern having been
sufficient to have caused Larry to have a difficult time sleeping at night with Jonathan in the house. 
The Department personnel testified that Larry had voiced fears that Jonathan could kill them all. 
After Jonathan attempted suicide at Larry and Rosemary's residence, Larry told Jonathan he would
have to leave the house. At trial, Larry insisted that he only kicked Jonathan (and not Verna) out of
the house. However, he also did complain of Verna's promiscuous behavior at the time and was
aware that Verna and L.F.B. had moved from his house and into a house with Jonathan. Larry saw
Verna take L.F.B. from the house he shared with Rosemary and admitted that he knew that L.F.B.
would be living in a house with Jonathan. Rosemary testified that Verna told her and Larry that she
was going to leave with Jonathan. The record indicates that Larry and Rosemary were well aware
that L.F.B. would be living in a residence with both Verna and Jonathan. 

 Rosemary testified that she did not then share Larry's concerns about Jonathan at that point, 
indicating that she was unafraid of Jonathan and characterized him as being "all talk." Despite
Rosemary's assertion that she did not fear Jonathan, the record shows that both she and Larry
instructed Verna not to leave L.F.B. alone with Jonathan. While this may show some concern for
L.F.B.'s well-being, it also demonstrates that Larry and Rosemary did know that there were
conditions present in the household with Verna and Jonathan that presented potential threats to the
child's physical or emotional well-being. 

 Larry and Rosemary testified generally that they tried to obtain the return of L.F.B. 
Specifically, Larry testified that he and Rosemary tried to get L.F.B. back once in January 2005. The
record provides little detail on this attempt and, considering the events that would follow and the act
of their having returned L.F.B. to Verna and Jonathan, the evidence strongly suggests to the contrary:
that Larry and Rosemary did not make any attempt to gain custody of L.F.B. after Verna and
Jonathan moved to their own residence in Mount Vernon. We add that both Larry and Rosemary
testified that they did not contact anyone in an attempt to regain custody of L.F.B. So, even if Larry
and Rosemary made an unassisted attempt to get L.F.B. back, that attempt was sorely inadequate to
constitute a genuine effort to remove L.F.B. from the dangerous surroundings into which she had
been placed.

 C. Following the Stabbing Incident

 If the danger in which L.F.B. was living was not yet clear when Larry saw fit to insist that 
Jonathan remove himself from their house, the danger became frightfully apparent February 20,
2005, when Jonathan stabbed Verna and himself. We begin by observing that conduct of a person
in the home can create an environment that endangers the physical and emotional well-being of a
child under Section 161.001(1)(D). See In re W.S., 899 S.W.2d 772, 776 (Tex. App.--Fort Worth
1995, no writ). The record is clear that L.F.B. was in the house when Jonathan stabbed Verna and
that Larry and Rosemary learned of the stabbing soon after the incident. 

 The record also shows that L.F.B. stayed at Larry and Rosemary's house for only a short
period of time (three days to a week) following the stabbing incident. Further, Rosemary testified
that, following the stabbing, Verna was "emotionally upset" and then unable to take care of a child. 
Nevertheless, Larry and Rosemary allowed the "emotionally upset" Verna to return L.F.B. to the
household with Jonathan. In fact, it appears that Rosemary herself actually delivered L.F.B. to Verna
and that Larry knew when she did so. Rosemary maintains that she only allowed L.F.B. to return
to Verna, not to Jonathan. First, we note the concerns that Rosemary should have entertained
regarding the return of the child to Verna, whether she was alone or whether she was with Jonathan. 
Further, nothing in the record suggests that Verna was living away from Jonathan. 

 Larry testified that Rosemary's biological mother (L.F.B.'s maternal grandmother) came to
live with Verna and Jonathan and to assist in the care of L.F.B. Superficially, this development
might be said to demonstrate to Larry and Rosemary that efforts were being made to improve the
surroundings and conditions in which L.F.B. would be living. However, such a conclusion would
ignore the evidence which suggests that L.F.B.'s maternal grandmother was, herself, a possible threat
to L.F.B.'s well-being. The record suggests that Rosemary, Verna, and their siblings were abused
and that this same woman, while in a bar, attempted to give away her own children (i.e., Rosemary,
Verna, and their siblings), although the record is unclear as to when Larry and Rosemary learned of
that specific information. Larry testified that he did not learn of that information until the spring of
2005 perhaps after many of the events in question here. Nonetheless, it appears that Larry and
Rosemary had a more general knowledge of the allegations of abuse or neglect by the maternal
grandmother of her own children. Larry testified that he knew of the grandmother's possibly abusive
history with her own children. Rosemary testified that her mother gave up her children due to her
use of drugs. 

 The record leaves little doubt that, with Larry's knowledge and acquiescence, Rosemary took
L.F.B. from Larry and Rosemary's house into conditions or surroundings which endangered L.F.B.
and that both Larry and Rosemary were well aware of the unsafe, even dangerous, conditions and
surroundings which were created by Verna and Jonathan. Representatives of the Department
testified that Larry and Rosemary made no genuine attempt to take custody of L.F.B. after the
stabbing incident; contrarily, Larry and Rosemary provided general testimony that they did, in fact,
attempt to get L.F.B. back into their possession on several occasions, but they never called Child
Protective Services about their concerns for L.F.B. 

 D. Following L.F.B.'s Removal from Verna and Jonathan's Household

 Shortly after the stabbing incident, Verna and Jonathan decided to move to Smithville where,
presumably, Jonathan could seek appropriate mental health treatment. Rosemary testified that she
only discovered that Verna was taking L.F.B. to central Texas when Verna called her and said that
she, L.F.B., and Jonathan were on the way there. The Department confirmed that Rosemary was
aware that L.F.B. was with Verna and Jonathan in Smithville. Rosemary admitted that she made no
contact with anyone to determine what steps would be required in order to obtain L.F.B.'s return
from Smithville and back into her custody. 

 Rosemary testified that, at one point, Verna had threatened death to anyone who tried to take
L.F.B. from her. Rosemary testified that she believed that Verna's threat was not an idle one, but
then offered conflicting testimony regarding her reaction to it. First, Rosemary testified that she was
not scared. Moments later, when asked why she did not call police about the threat, she explained
that she was scared. Later, Rosemary again testified that she was not scared of Verna. The evidence
of Verna's threat is general and the record suggests that Rosemary was, nevertheless, unafraid of
Verna anyway. We, therefore, observe that this threat would not have served to prevent Rosemary
from taking reasonable steps to extricate L.F.B. from the dangerous surroundings into which she had
been placed. Additionally, we note that Rosemary was presented with ample opportunity to remove
L.F.B. from the situation prior to Verna's alleged threat, the most obvious chance having been when
Rosemary had possession of L.F.B. following the stabbing.

 The Department employees testified that when the Department personnel learned of the
unusual custody arrangement regarding L.F.B., a Department employee contacted Rosemary the day
after L.F.B. was removed from the custody of Verna and Jonathan in Smithville. Although Larry
confirmed this contact, Rosemary denied it. Even after the stabbing and the removal of L.F.B. by
the Department, Rosemary still wanted L.F.B.'s custody to be returned to Verna, if possible. The
Department officials testified that Rosemary wanted to take custody of L.F.B. only if the Department
concluded that it would not give Verna custody of the child. Although Rosemary changed her
position on that matter by the time of trial, this disregard of the risks L.F.B. faced in the household
with Verna and Jonathan represents evidence supporting the trial court's finding. 

IV. CONCLUSION

 Regardless of the alleged lack of knowledge regarding the removal and the excuses Larry and
Rosemary tendered for their failure to take adequate steps to regain custody of L.F.B. after the
dangers to her became openly apparent to any reasonable person in their position, the record provides
clear and convincing evidence that Larry and Rosemary knew that L.F.B was living in surroundings
that endangered her physical and emotional well-being. The evidence suggests that, from the
beginning, Larry, who had once been married to Verna, and Rosemary, Verna's half-sister, knew that
conditions existed that were potentially dangerous to L.F.B.'s welfare. However, even if they had
believed that Verna had changed and was now a suitable parent to raise a child, it became abundantly
clear throughout the next few months that L.F.B. was living in surroundings that endangered her
physical and emotional well-being. Despite the overwhelming evidence supporting this conclusion,
Larry and Rosemary allowed Verna to maintain custody of L.F.B. In fact, Rosemary had L.F.B. in
her possession immediately after the stabbing incident and, after attaching meaningless conditions,
returned L.F.B. to the custody of Verna and the presence of Jonathan. Rosemary testified at one
point to the following: "You're sitting here putting me on trial for it. And I'm not the one who did
it. It's Verna and Jonathan. . . . . They're the ones responsible for [L.F.B.] being where she's at." 
In this statement, she neglected the inescapable fact that it was she and Larry who had placed L.F.B.
with Verna and Jonathan, despite knowing that L.F.B.'s physical and emotional well-being were
endangered and that they allowed L.F.B. to remain in those unstable and violent surroundings even
when given the opportunity to keep the child out of those surroundings. The evidence is such that
the trial court could have formed a firm belief or conviction, based on the clear and convincing
evidence at trial, that Larry and Rosemary placed L.F.B or allowed L.F.B. to remain in conditions
or surroundings that endangered her physical and emotional well-being. Accordingly, we overrule
Larry and Rosemary's point of error.

 We affirm the trial court's judgment. (6)




 Bailey C. Moseley

 Justice


Date Submitted: April 27, 2007

Date Decided: July 12, 2007


1. The background becomes further complicated when the record also reflects that Verna had
previously been married to Larry, putting her in the dual role of not only being the half-sister to
Rosemary and sister-in-law to Larry, but also being Larry's former wife. 
2. Section 161.001 provides the following:


 The court may order termination of the parent-child relationship if the court
finds by clear and convincing evidence:


 (1) that the parent has:


 (A) voluntarily left the child alone or in the possession of
another not the parent and expressed an intent not to return . . . .


Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2006).
3. Termination of parental rights may be supported by clear and convincing evidence that a
parent:


 (N) . . . constructively abandoned the child who has been in the permanent or
temporary managing conservatorship of the Department of Family and Protective
Services or an authorized agency for not less than six months, and:


 (i) the department or authorized agency has made reasonable efforts to return
the child to the parent;


 (ii) the parent has not regularly visited or maintained significant contact with
the child; and


 (iii) the parent has demonstrated an inability to provide the child with a safe
environment . . . .


Tex. Fam. Code Ann. § 161.001(1)(N).
4. In reviewing the evidence for legal sufficiency, we must determine whether the evidence is
such that a fact-finder could reasonably form a firm belief or conviction that the grounds for
termination were proven. In re J.F.C., 96 S.W.3d 256, 265-66 (Tex. 2002). We must review all the
evidence in the light most favorable to the finding and judgment and assume that the fact-finder
resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. Id.
at 266. We must also disregard all evidence that a reasonable fact-finder could have disbelieved but
consider undisputed evidence even if it is contrary to the finding. Id. 

 In a factual sufficiency review, in determining whether the evidence is such that a fact-finder
could reasonably form a firm belief or conviction that its finding was true, we must consider whether
disputed evidence is such that a reasonable fact-finder could not have resolved it in favor of the
finding. Id. If, in light of the entire record, the disputed evidence that a reasonable fact-finder could
not have credited in favor of the finding is so significant that a fact-finder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the evidence is factually
insufficient. Id.
5. Rosemary testified about the seven children she had prior to the birth of L.F.B. She
explained that, of those seven previous children, her parental rights to six of them had been
terminated and she had relinquished her rights to one of them. She agreed that she has had eight
children and never raised any one of them for more than four years. 
6. We also note that the order of termination of parental rights found by clear and convincing
evidence three grounds for terminating Larry's parental rights to L.F.B and four grounds for
terminating Rosemary's parental rights. They did not raise the sufficiency of the evidence as it
relates to any of those other issues in their statements of points on appeal. Nor did they challenge
the sufficiency of the evidence to support any of those other grounds in their appellate brief. It is
well established that sufficient evidence of one basis for termination of parental rights is sufficient
to sustain the termination. See In re T.N.F., 205 S.W.3d 625, 629 (Tex. App.--Waco 2006, pet.
denied).